817 P.2d 238

**C.R. ANTHONY COMPANY, an Oklahoma corporation, Plaintiff–Appellee,**

v.

**LORETTO MALL PARTNERS, Defendant–Appellee,**

v.

**DARTFORD COMPANY, N.V., Defendant–Appellant,**

and

**Intershop HFA Management USA Company, Defendant–Cross–Appellant.**

No. 19490.

Aug. 9, 1991.

Poole, Kelly & Ramo, Keith S. Burn, Albuquerque, for appellant Dartford Co.

Kemp, Smith, Duncan & Hammond, Ken Coffman, El Paso, Tex., for cross-appellant Intershop HFA.

Modrall, Sperling, Roehl, Harris & Sisk, Janet R. Braziel, Walter Hart, Albuquerque, for appellee C.R. Anthony Co.

Lloyd O. Bates, Jr. Law Firm, Kyle Gesswein, Las Cruces, for appellee Loretto Mall Partners.

## OPINION

RANSOM, Justice.

This is a suit to recover excess rent claimed to have been paid under an amendment to a lease of retail space in a Las Cruces shopping mall. It was brought by C.R. Anthony Company (Anthony's) against its landlord, Loretto Mall Partners, and against Dartford Company, N.V. Anthony's originally negotiated and concluded the lease amendment with Dartford in 1982. Loretto purchased the shopping mall

in 1984 and succeeded to Dartford's interest. Defendants Loretto and Dartford will be referred to collectively as "the Mall."

The trial court found the rental provisions of the lease amendment to be unambiguous and awarded summary judgment in favor of Anthony's for the return of $167,971.02 in payments. The Mall appeals, claiming the lease amendment is ambiguous and that, further, if it is interpreted to require the return of the payments, then a factual issue exists whether the lease amendment as drafted represents a mutual mistake that requires reformation. The Mall also argues that there is a genuine issue of fact whether Anthony's claim for the return of rental payments is barred by laches.

We agree with the trial court that the lease amendment contains no ambiguity. However, we believe the Mall has made a sufficient factual showing to preclude summary judgment on the question of mutual mistake. For that reason we reverse the order of summary judgment and remand for evidentiary proceedings to resolve the mistake issue.

Additionally, Loretto has asserted a cross-claim against Dartford for breach of warranty. At the time Loretto purchased the mall, Dartford warranted in the purchase and sale agreement that Anthony's rental obligation under the lease amendment conformed with its past payments. The trial court granted summary judgment in favor of Loretto on this claim. Dartford appeals this decision, claiming a factual issue exists whether Loretto actually relied on the warranty. We briefly will address Dartford's reliance argument inasmuch as that question may arise again on remand.

Anthony's original lease required a minimum annual rent of $9,350 in monthly installments of $779. Additionally, Anthony's was required to pay a percentage rent equal to 2.5 percent of its annual sales, less the minimum annual rental. Under this arrangement, Anthony's rental obligation was 2.5 percent of its sales over $374,000 because the minimum rent of $9,350 became 2.5 percent of sales at that point. Sales of $374,000 represent what is called a "natural breakpoint" in the lease. That figure is derived by dividing the minimum annual rental by the percentage rent of 2.5 percent. While a natural breakpoint figure such as $374,000 has a direct mathematical relationship to the minimum and percentage rentals, parties to a lease may negotiate and agree on some alternative breakpoint having no mathematical relation to the minimum or percentage rental figures. For instance, the parties might agree on a base rental of $9,350, but agree to an additional payment of 2.5 percent of annual sales over $500,000, or $1,000,000. The breakpoint figure in that case would be what is termed an "artificial breakpoint."

In 1981 Anthony's became interested in expanding its retail space to include the adjacent available premises. To this end Anthony's began negotiations with John Decker of Intershop HFA Management USA Co., the managing agent for Dartford. The negotiations culminated in the lease amendment dated January 18, 1982. In pertinent part, the lease amendment provides for a minimum rent and a percentage rent as follows:

3.1 *Minimum Rental.* A Minimum Rental for the Leased Premises of Fifty-five Thousand Six Hundred Eleven and No/100 Dollars ($55,611.00) per Lease Year payable at the rate of Four Thousand Six Hundred Thirty-four and 25/100 Dollars ($4,634.25) per month in advance beginning on the Commencement Date and continuing thereafter on the first day of each calendar month for the term of the Lease.

3.2 *Percentage Rental.* A Percentage Rental, which shall be deemed additional rental hereunder, in the sum equal to two and one-half percent (2½%) of the "Net Retail Sales" from transactions made in, on or from the Leased Premises by Tenant during each "Lease Year" in excess of the "Base Net Retail Sales Figure" for the "Lease Year".

. . . .

3.2.2 *Base Net Retail Sales Figure.* The "Base Net Retail Sales Figure" is the following: Two Million Two Hundred

Twenty-four Thousand Four Hundred and No/100 Dollars ($2,224,400.00).

The breakpoint established by the lease amendment, although not so designated, coincides with the natural breakpoint rounded to the nearest one hundred dollars.[1]

At issue here is the operation and effect of a provision making certain adjustments to the lease amendment in the event the anchor tenant at the mall, J.C. Penney Co., failed to renew its lease and left the premises. That section, which adjusts the minimum rental but does not mention percentage rental obligations, provides:

> 9. *Required Lease.* If within nine months after J.C. Penney closes its store in the Shopping Center, Landlord is unable to replace J.C. Penney with a new tenant (approved by Tenant, approval not to be unreasonably withheld) open for business in the space now occupied by J.C. Penney, the Minimum Rental set forth in paragraph 3.1 above shall be reduced to $18,370.00 per Lease Year payable at the rate of $1,530.83 per month.

J.C. Penney vacated the mall and was not replaced. On April 3, 1983, Anthony's began making reduced minimum rental payments pursuant to paragraph 9 of the lease amendment. Between 1983 and 1988 Anthony's submitted percentage rent payments of 2.5 percent of sales over a natural breakpoint based on the minimum rent set forth in paragraph 9 of the lease amendment. The newly computed breakpoint was $734,800 (the yearly rental obligation, $18,370, divided by the agreed percentage of 2.5 percent).

An internal audit of Anthony's records conducted in 1988 revealed an alternative construction of paragraph 9. Under that interpretation, asserted by Anthony's below, the breakpoint is set forth in paragraph 3.2.2, *i.e.*, $2,224,400, regardless of whether J.C. Penney leaves the mall. Under Anthony's interpretation, it overpaid its percentage rental obligation during the 1983–1988 period by $167,971.02. After hearing all proffered evidence to aid the court in the interpretation of the terms of the amended lease, the trial court entered summary judgment in Anthony's favor for the full amount of the claimed overpayment.

 *Contract litigation.* The trial court must decide as a threshold issue the essential terms of a contract in litigation and, by construction, the court must decide what missing terms either are necessarily implied by the contract's express terms or were not contemplated by the agreement at all. In accomplishing this task, the court well may be called upon to decide whether the writing was intended as the contract agreed upon by the parties. If the court decides the writing was intended as the contract, the court is bound by the parol evidence rule from hearing collateral evidence for the purpose of construing the contract in a manner that varies or contradicts the clear and unambiguous language of the writing.

 The court may, nonetheless, be called upon to decide if the writing, intended as the contract, is ambiguous or by mistake has stated a term contrary to the intent of the parties. In New Mexico, if the court finds ambiguity, the jury (or court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding breach and damages. The court decides the ultimate fact of mistake, because of the equitable nature of the reformation remedy, before breach and damages or issues of restitution are decided. In deciding mistake, however, the court is acting as a fact finder and must accord the parties a full evidentiary hearing (unless the absence of a genuine issue of material fact warrants summary judgment). Today we address two of the issues set forth above: contract interpretation and mistake.

 *Contract interpretation—ambiguity.* Contract interpretation is the process of giving meaning to the symbols of expression used by the parties. 3 A. Cor-

---

1. The "Base Net Retail Sales Figure," $2,224,400, established in paragraph 3.2.2 is the same as the natural breakpoint ($55,611 divided by 2.5% equals $2,224,440).

bin, *Corbin on Contracts* § 532 (1960) [hereinafter *Corbin*]. The process often turns upon whether the court determines that the contract is ambiguous. If so, evidence will be admitted to aid in interpreting the parties' expressions. *See, e.g., Hill v. Hart*, 23 N.M. 226, 232, 167 P. 710, 711 (1917) ("It is well settled that, where the terms of a contract are obscure and uncertain, evidence of antecedent negotiations and of the facts and circumstances surrounding the parties is admissible to enable the court to put itself in the place of the parties to the contract and to view it as they viewed it.... The principle that parol evidence is not admissible to vary the terms of a written instrument is not infringed when the evidence is used for the purpose of ascertaining the meaning of doubtful expressions in the instrument."); *see also Fancher v. Board of Comm'rs*, 28 N.M. 179, 207, 210 P. 237, 248 (1922) (in determining severability of terms of a contract the operative question is parties' intent and where intent is clearly indicated by terms of contract, inquiry is at an end, otherwise, resort may be had to nature of the subject matter of the contract). On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible *to vary or modify its terms. Franciscan Hotel Co. v. Albuquerque Hotel Co.*, 37 N.M. 456, 462, 24 P.2d 718, 721 (1933).

■ A series of cases have extended these seminal interpretation rules to exclude evidence of circumstances surrounding the transaction for the purpose of determining whether a contract is ambiguous. These cases have intimated, but have not expressly adopted, a "plain-meaning" or "four-corners" standard: Ambiguity is determined by the court without the admission of evidence of surrounding circumstances to explain the purposes and context of the contract. *See, e.g., Clark v. Sideris*, 99 N.M. 209, 213, 656 P.2d 872, 876 (1982) (court will not look beyond the four corners of the document unless it is ambiguous); *Acquisto v. Joe R. Hahn Enters.*, 95 N.M. 193, 195, 619 P.2d 1237, 1239 (1980) (same).

Recognizing the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding, numerous courts have eschewed strict application of the four-corners standard. *See, e.g., Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968); *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 577–81, 556 A.2d 81, 83–84 (1988) (citing cases); Annotation, *Comment Note.—The Parol Evidence Rule and Admissibility of Extrinsic Evidence to Establish and Clarify Ambiguity in Written Contract*, 40 A.L.R.3d 1384 (1971) [hereinafter *Annotation*]. In addition, many scholarly authorities have urged rejection of a four-corners standard. *See, e.g.*, 2 E. Farnsworth, *Farnsworth on Contracts* § 7.12a, at 279 (1990) [hereinafter *Farnsworth*] ("In determining whether contract language is ambiguous, a court is not limited to the face of the contract itself."); 3 *Corbin* § 536, at 28 ("[I]t is invariably necessary, before a court can give any meaning to the words of a contract ... that extrinsic evidence shall be heard to make the court aware of the 'surrounding circumstances,' including the persons, objects, and events to which the words can be applied and which caused the words to be used.").

In *Levenson v. Mobley*, 106 N.M. 399, 744 P.2d 174 (1987), this Court retreated from strict application of the four-corners standard. In *Levenson* we held that the parol evidence rule did not bar admission of evidence extrinsic to a written contract to determine the circumstances under which the parties contracted and the purpose of the contract. *Id.* at 403, 744 P.2d at 178 (citing *Estate of Russell v. Quinn*, 69 Cal.2d 200, 444 P.2d 353, 70 Cal.Rptr. 561 (1968)). We quoted with approval language from *Russell* to the effect that evidence of circumstances surrounding the transaction is admissible to aid the court in determining whether chosen terms are clear, but did not expressly overrule New Mexico cases to the contrary. We hold today that in determining whether a term or expression to which the parties have

agreed is unclear,[2] a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. *See, e.g., Eskimo Pie Corp. v. Whitelawn Dairies*, 284 F.Supp. 987, 995 (S.D.N.Y.1968).[3] New Mexico case law to the contrary is hereby overruled. It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions. *See* 3 *Corbin* § 537 (rules governing admissibility of proof of surrounding circumstances depend upon person whose meaning is at issue).

■ *–Parol evidence rule addresses modifications and contradictions.* The parol evidence rule is a rule of substantive law that bars admission of evidence extrinsic to the contract to contradict and perhaps even to supplement the writing. *See Bell v. Lammon*, 51 N.M. 113, 179 P.2d 757 (1947) (discussing parol evidence rule). The rule should not bar introduction of evidence to explain terms. As Professor Corbin observes, "No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation the meaning of the writing is determined."

Corbin, *The Parol Evidence Rule*, 53 Yale L.J. 603, 622 (1944). The operative question then becomes whether the evidence is offered to contradict the writing or to aid in its interpretation.[4] We leave these distinctions to case-by-case development by our lower courts.

■ *–Interpretation question of law or fact.* New Mexico courts long have held that the question of whether a contractual term or provision is susceptible to reasonable but conflicting meanings, *i.e.*, whether there is ambiguity, is one of law. *See, e.g., Young v. Thomas*, 93 N.M. 677, 679, 604 P.2d 370, 372 (1979). We also have held, however, that if the court finds ambiguity, the jury (or the court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding issues of breach and damages. *Paperchase Partnership v. Bruckner*, 102 N.M. 221, 223, 693 P.2d 587, 589 (1985). The question of interpretation of language and conduct (the question of the meaning to be given the words of the contract) is a question of fact where that meaning depends on reasonable but conflicting inferences to be drawn from events occurring or circumstances existing before, during, or after negotiation of the contract. There is, as Professor Corbin points out, "no 'legal' meaning, separate and distinct from some person's meaning in fact." 3 *Corbin*

---

2. Ambiguity, as it has been used in this state, is best understood as a proxy for describing lack of clarity in the parties' expressions of mutual assent. The term, as it has been employed, incorporates a variety of conceptual problems including the distinctive notions of ambiguous syntax, ambiguous terms, vagueness, and general lack of clarity.

3. In this regard, we join with the *Restatement (Second) of Contracts*, Professors Corbin and Farnsworth, and the developing law in other jurisdictions. *Restatement (Second) of Contracts* § 212 comment b (1979) (any determination of meaning or ambiguity should only be made in the light of the preliminary negotiations and other factors); 3 *Corbin* § 579 (the parol evidence rule does not apply to matters of interpretation); 2 *Farnsworth* § 7.12, at 277 ("it has become increasingly difficult to defend the restrictive view"); *see, e.g., Pacific Gas & Elec.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968); *Garden State Plaza Corp. v. S.S. Kresge Co.*, 78 N.J.Super. 485, 496–98, 189 A.2d 448,

454–55 (1963); *see also Annotation*, 40 A.L.R.3d 1384 (especially Section 4).

4. We point out that protective devices are available to preserve the integrity of the interpretation process. For example, as the court in *Isbrandtsen* suggested, evidence can be presented to the court through an offer of proof, or conditionally admitted subject to a motion to strike. *Isbrandtsen*, 150 Vt. at 579 n. *, 556 A.2d at 84 n. *. Alternatively, California has adopted a two-step process for contract interpretation. First, the court provisionally receives, without actually admitting, all credible evidence concerning the intention of the parties. Second, and only if the court decides in light of this extrinsic evidence that the contract is reasonably susceptible to the offered interpretation, the court admits the evidence in order to interpret the contract. *Blumenfeld v. R.H. Macy & Co.*, 92 Cal.App.3d 38, 45, 154 Cal.Rptr. 652, 655 (1979). In any case, the screening of proffered evidence by the court should occur outside the presence of a jury.

§ 554, at 219. It may be that the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one. In that case, to the extent the court decides the issue, the question then may be described as one of law.[5] *See Owen v. Burn Constr. Co.,* 90 N.M. 297, 301, 563 P.2d 91, 95 (1977); *see also Ram Constr. Co. v. American States Ins. Co.,* 749 F.2d 1049 (3d Cir.1984) (discussing distinction between questions of law and fact in cases of contract interpretation and construction). However, if the proffered evidence is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the ultimate factual issues must be resolved by the appropriate fact finder with the benefit of a full evidentiary hearing. To hold otherwise would be to relegate to judicial divination the determinative issues of many contract disputes.

▮ *–Appellate review of contract interpretation.* We often have said that an appellate court is not bound by the trial court's conclusions of law. *See, e.g., Whitehurst v. Rainbo Baking Co.,* 70 N.M. 468, 470, 374 P.2d 849, 850 (1962) (appellate court may independently draw its own legal conclusions). That is, an appellate court need not defer to the trial court's conclusions of law and, upon analysis of the record as established below, may reach a conclusion different from that of the trial court. On the other hand, we review findings of ultimate fact, whether by court or by jury, under the substantial evidence standard. *Whorton v. Mr. C's,* 101 N.M. 651, 653, 687 P.2d 86, 88 (1984). Here, we are satisfied that the trial court considered all evidence adduced in response to the motion for summary judgment, including collateral or extrinsic evidence of the circumstances surrounding the execution of the lease amendment, and quite properly found no ambiguity. As we have explained, extrinsic evidence may be offered to aid the court in the threshold determination involving the interpretation of contract terms.

▮ The appellants argue that ambiguity in the lease amendment is revealed by a series of letters, between John Decker of Intershop and Berle Miller of Anthony's, sent prior to execution of the lease amendment in January 1982. The letters showed that the thrust of the bargaining concerned the minimum rental expressed in dollars per square foot. It appears that the parties had tentatively agreed to a percentage rent of "2.5% less base rent."[6] Sometime in November 1981, after Miller expressed his concern to Decker that J.C. Penney, the anchor tenant, might not renew its lease with the Mall, the parties began to negotiate lease terms addressing that contingency. In a telex dated November 23, 1981, Decker advised Dartford that Anthony's wished to be able to cancel its lease and vacate the premises if J.C. Penney were to leave, and if Dartford were to have been unable to secure another anchor tenant. Decker advised Dartford that instead of cancellation Dartford should agree to a reduction in minimum rent and that a new "percentage rent breakpoint would be computed on [the] reduced base [rent]." Dartford agreed; and on the same date, November 23, Decker sent Miller a letter stating that if J.C. Penney left, and if the Mall failed to secure a new anchor tenant within nine months, the minimum rent would be

---

**5.** A court may employ the many rules of contract interpretation that do not depend on evidence extrinsic to the contract. *See, e.g., Smith v. Tinley,* 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (reasonable interpretation of contract is favored); *Schultz & Lindsay Constr. Co. v. State,* 83 N.M. 534, 536, 494 P.2d 612, 614 (1972) (uncertainties construed strictly against drafter); *Id.* at 535, 494 P.2d at 613 (each part of contract is to be given significance according to its place in the contract so as to give effect to the intentions of the parties). To the extent a court resolves an issue of contract interpretation solely by reference to such aids, or by traditional rules of grammar and punctuation, without resort to evidence of surrounding facts and circumstances, then that issue, as well, may be described as one of law.

**6.** By letter to Miller dated June 4, 1981, Decker proposed minimum rent of $4.00 per square foot and percentage rent of 2.5%. On August 26, 1981, Miller agreed to the 2.5% percentage rent, but countered with minimum rent of $3.15 per square foot. On October 9, 1981, Decker confirmed the percentage rent of "2.5% less base [or minimum] rent" and proposed minimum rent of $3.33 per square foot.

reduced. Significantly, the letter to Miller did not mention any recomputation of the breakpoint.

Miller then prepared a written expansion proposal, which was approved by Anthony's executive committee on November 28, 1981. With respect to J.C. Penney's departure, the expansion proposal simply referred to the November 23 letter from Decker to Miller which, as described above, made no mention of percentage rental obligations. The expansion proposal and the letters mentioned above were forwarded to Anthony's real estate counsel who drafted the lease amendment.

This evidence, and other evidence explaining the nature of natural and artificial breakpoints, explains the nature of commercial retail leasing and the circumstances leading up to the lease amendment in this case. It does not, however, reveal any ambiguity in the sense that the terms employed in the lease amendment regarding "percentage rental" and "base net retail sales figure" ($2,224,400) may be understood to be vague, uncertain, or reasonably susceptible to more than one interpretation. To the contrary, the lease amendment requires Anthony's each year to pay a sum equal to 2.5 percent of its net retail sales in excess of $2,224,400. Paragraph 9, providing for a reduction in the minimum rental in the event J.C. Penney were to vacate the premises and Dartford were to have been unable to find a replacement tenant within nine months, simply fails to provide that the base net retail sales figure of $2,224,400 will be recalculated or changed in any way in the event the Mall loses its anchor tenant. Thus, the offered evidence does not clarify or explain the percentage rental provisions in the lease amendment. It would add to the lease amendment a new provision providing for the recalculation of the base net retail sales figure. This added provision would contra-

dict the only provision in the executed lease amendment regarding the percentage rental obligation. Rather than show ambiguity in the lease amendment, or clarify its provisions, the evidence, as explained below, raises a factual issue whether the parties mistakenly omitted from the lease amendment an agreement to adjust the base net retail sales figure in the event the minimum rent was reduced to $18,370.

■■■ *Reformation based upon mistake.* In *Cleveland v. Bateman,* 21 N.M. 675, 158 P. 648 (1916), this Court held reformation of a written instrument proper upon a finding that " 'there is a mutual mistake; that is, where there has been a meeting of minds, an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto.' " *Id.* at 684, 158 P. at 650 (quoting 4 J. Pomeroy, *Pomeroy's Equity Jurisprudence* § 1376); *see also Morris v. Merchant,* 77 N.M. 411, 423 P.2d 606 (1967) (same).[7] In determining whether reformation is appropriate because the agreement is at variance with the mutual understanding of the parties, the parol evidence rule does not bar evidence of prior negotiations for the purpose of establishing the claimed mistake. 2 *Farnsworth* § 7.5, at 225; *see also Drink, Inc. v. Martinez,* 89 N.M. 662, 556 P.2d 348 (1976) (parol evidence rule does not bar extrinsic evidence for purpose of determining whether by mistake there was no consent to the apparent agreement); 3 *Corbin* § 580 (same). Indeed, all relevant evidence tending to establish that the writing does not conform to the parties' mutual agreement is admissible.

■■■ A genuine issue of material fact concerning the existence of an agreement, antecedent to the execution of the lease amendment, that the percentage rental obligation in J.C. Penney's absence

7. The legal grounds for reformation based upon mutual mistake are to be distinguished from those which entitle a party to avoid the contract based on mistake. To avoid a contract based on mutual mistake, the party adversely affected by the mistake must show that: (1) The mistake goes to a basic assumption on which the con-

tract was made; (2) the mistake has a material effect on the agreed exchange of performances; and (3) the mistake is not one for which that party bears the risk. *Restatement (Second) of Contracts* § 152; *State ex rel. State Highway & Transp. Dep't v. Garley,* 111 N.M. 383, 806 P.2d 32 (1991) (discussing distinction).

would be based upon a natural breakpoint, is presented by evidence of the negotiations leading up to the lease amendment and by the conduct of the parties in using, for a period of five years, a natural breakpoint for the computation of percentage rental payments.[8] Industry practice suggests that, in percentage rental leases, the breakpoint will be a natural breakpoint unless some other breakpoint is specifically negotiated by the parties. Anthony's makes an argument, but not a conclusive one, that the base net retail sales figure of $2,224,-000 was the breakpoint actually negotiated by the parties as reflected by the unambiguous language of the lease amendment. Yet, there is no evidence showing explicit negotiation of an artificial breakpoint. The conflicting inferences to be drawn from the evidence regarding the parties' intent ought to be resolved by the fact finder after a full evidentiary hearing.

■ *Issue raised on cross-appeal: reliance upon written warranties.* Pursuant to the 1984 purchase and sale agreement, Dartford warranted to Loretto that a synopsis of leases attached to the agreement contained a correct description of the leases affecting the mall. The synopsis showed Anthony's rent to be 2.5 percent of annual sales over $774,800.[9] Loretto brought a cross-claim against Dartford for breach of warranty, and the trial court entered summary judgment in favor of Loretto.

Citing *Steadman v. Turner,* 84 N.M. 738, 507 P.2d 799 (Ct.App.1973), Dartford and Intershop assert that a factual issue whether Loretto relied on the warranties contained in the sale agreement precludes summary judgment. *Steadman,* which relied upon *Vitro Corp. of America v. Texas Vitrified Supply Co.,* 71 N.M. 95, 376 P.2d 41 (1962), is inapposite. At issue in *Steadman* was whether the seller had given an express warranty, and if so, whether the buyers had a right to rely on it, 84 N.M. at 742, 507 P.2d at 803. *Steadman* did not address reliance as an essential element of a claim for breach of an express warranty contained in a written agreement. In *Vitro,* however, we explained that " 'if an express warranty has been given in express terms as a part of the contract of sale, no proof of reliance thereon would have been necessary.' " *Vitro,* 71 N.M. at 105, 376 P.2d at 48 (quoting 1 S. Williston, *Williston on Sales* § 206, at 534–35 (Rev. ed. 1948)). Accordingly, because reliance is not an element of a claim for breach of an express warranty reduced to writing, there is no material issue of fact thereon.

For the these reasons, we affirm in part, reverse in part, and remand the cause to the trial court with instructions to afford the parties a full evidentiary hearing to include the question of mutual mistake. We do not reach the question of laches, and the merits of that issue may be raised in the proceedings on remand.[10] The question

8. Anthony's argues that the payment history is irrelevant because Miller, who negotiated the contract for Anthony's, was unaware of the payment history. That is, the payment history did not make either more or less probable Miller's claimed intent at the time the lease was amended. This argument ignores the fact that Miller's intent is imputed to the corporation. *See Trinity Univ. Ins. Co. v. Rocky Mtn. Wholesale Co.,* 353 F.2d 574, 577 (10th Cir.1965); *Sawyer v. Mid-Continent Petroleum Corp.,* 236 F.2d 518, 520–21 (10th Cir.1956). The question then is the intention of Anthony's, not the intention of Miller. An inference that this intention was as claimed by the Mall could be drawn from Anthony's conduct during the five years after the lease was amended.

Additionally, Anthony's argues that there exist only two relevant documents regarding these negotiations, and neither relates to the percentage rental issue. During oral argument we at-

tempted to clarify with counsel for Anthony's why she thought the argument of the Mall depended upon an agreement to a change in the percentage. She had no specific response, and we believe the artificial breakpoint argument is no way dependent upon some explicit understanding that there would be a change in the percentage rate charged.

9. Curiously, that figure does not correspond to a natural breakpoint as Dartford and Intershop allege. As observed above, the natural breakpoint, under the yearly base rent of $18,370, is $734,800. Neither party has called attention to the significance, if any, of this discrepancy.

10. We do not agree with Anthony's characterization of its suit as an action at law that makes irrelevant certain equitable defenses. For one, a judgment or decree for the restitution of money mistakenly paid was available both at com-

would seem relevant both to the Mall's defense of mistake and claim for reformation, as well as to Anthony's action for restitution based upon the express terms of the lease amendment.

IT IS SO ORDERED.

BACA and MONTGOMERY, JJ., concur.

mon law and in equity, and the principles applied in either case were the same regardless of the form of the action. *See* 3 *Corbin* § 613, at 710 (citing cases).