**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 19 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

RAY EUGENE WILCOX,

Plaintiff-Appellee,

v.

BARBER-COLMAN COMPANY,

Defendant-Appellant.

No. 00-2042
(D.C. No. CIV-99-125-BRB/LFG)
(D. N.M.)

**ORDER AND JUDGMENT** *

Before **TACHA,** Chief Judge, **EBEL**, and **BRISCOE**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Defendant-appellant Barber-Colman Co. appeals the district court's grant of summary judgment to plaintiff Ray Eugene Wilcox on his breach of contract suit. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.

Because the parties are familiar with the details of this matter, we begin with the sale, in October 1997, of Mr. Wilcox's business, DataTalk, to Barber-Colman. The October sale was structured through a Share Purchase Agreement which provided for a maximum purchase price of approximately $4,500,000. Two months later, the parties executed a "Consulting Agreement," the effective term of which was from October 1, 1997, through October 2000, and provided for annual compensation to Mr. Wilcox of $340,000 and for certain performance incentive bonuses. When combined, the amounts from the Share Purchase Agreement, the consulting fees, and the performance bonuses would approach, and could exceed, the $6,000,000 Mr. Wilcox had consistently demanded for the sale of his business.

After working as a consultant under the agreement for approximately one year, Mr. Wilcox notified Barber-Colman of his intention to terminate the contract. When Barber-Colman refused to pay him the annual compensation of $340,000 per year for the remaining two years, Mr. Wilcox brought suit.

The Consulting Agreement provides in relevant part:

> The Sieve Environmental Controls ("S.E.C.") division of
> Barber Colman Company hereby agrees to use the services of Ray E.

Wilcox ("Consultant") for the management and technical direction of the Development Engineering efforts of the group formerly operated as DataTalk Development Corporation. The following terms and conditions shall apply:

1.     Term.  This agreement shall become effective October 1st, 1997 and continue in effect until October 2nd, 2000.

2.     Termination of Agreement.  S.E.C. and Consultant shall have the right to terminate this agreement, with or without cause, with the issuance of a 90 day written notice of termination.  In the event of such termination, Consultant shall be entitled to receive from S.E.C. the remaining balance of the compensation terms outlined below unless the termination is for wilful misconduct.

3.     Payment.  For services rendered hereunder, S.E.C. shall pay Consultant the compensation set forth in the attached Schedule A, which is incorporated herein by reference.

4.     Task Assignment and Effort.  Consultant agrees to serve faithfully and exclusively to the best of his ability, energy, skill and specialized knowledge in the execution of this agreement.

. . . .

9.     Entire Agreement.  This agreement contains all commitments and major understandings between the parties hereto and with respect to the subject matter hereof and may not be modified except in writing and signed by Consultant and the duly authorized representative of S.E.C.

10.     Other Agreement.  The existence, performance or non-performance of this agreement shall not effect [sic] the obligations of the parties under the Share Purchase Agreement executed concurrently herewith.

Schedule "A" [1] provides:

> 1.      Annual compensation of $340,000, plus applicable New Mexico gross receipts tax, payable on a monthly basis.
>
> 2.      Wilcox may earn an additional performance incentive of $152,000 for the first year for achieving certain performance goals. For the first year of the agreement, the goals are as set forth in page 2 of this Schedule "A". For the remaining two years of the agreement, Wilcox may earn an additional incentive of $100,000 per year for achieving certain performance goals. Barber-Colman and Wilcox will agree, in good faith, to suitable and reasonable performance goals regarding this performance incentive for the remaining two years.

Appellant's App. Vol. I at 41.

The crux of the problem resulting in this lawsuit is the language in paragraph number 2 of the consulting agreement, relating to termination. Mr. Wilcox argues that, in the event of termination by either party, he was entitled to the remaining balance of the compensation; Barber-Colman maintains that only if *it* terminated the agreement could Mr. Wilcox rightfully make such a claim. Otherwise, Barber-Colman argues, Mr. Wilcox had to perform under the agreement in order to be paid.

---

[1]      Confusingly, there are two schedule A's to this Agreement: one designated simply **Schedule A** and the other **Schedule "A."** Schedule "A" is the relevant schedule for our immediate purposes; the other Schedule A defines various incentives based on identified deliverables.

After examining the surrounding circumstances, *see Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993), [2] the district court determined that the contract was unambiguous and that a reasonable person could reach only one conclusion as to its meaning. It therefore construed the contract as a matter of law and held that, upon termination by either party, Mr. Wilcox was entitled to receive the remaining balance of the compensation. The court then denied Barber-Colman's motion for summary judgment and granted summary judgment to Mr. Wilcox.

We review the grant of summary judgment de novo to determine whether there are any genuine issues of material fact and whether the movant was entitled to judgment as a matter of law. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999). "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." *Neustrom*, 156 F.3d at 1062 (quotation omitted). We also subject the district court's construction of the contract as a matter of law to the same de novo review. *Id.*

---

[2]     The district court applied New Mexico law in accordance with the assumption of the parties. "Because the parties proceed on the assumption that [New Mexico] substantive contract law applies, we apply that law without further analysis." *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1062 (10th Cir. 1998).

In New Mexico, the question of ambiguity is one of law and involves "whether a contractual term or provision is susceptible to reasonable but conflicting meanings." *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 243 (N.M. 1991).

> Ambiguity, as it has been used in [New Mexico], is best understood as a proxy for describing lack of clarity in the parties' expressions of mutual assent. The term, as it has been employed, incorporates a variety of conceptual problems including the distinctive notions of ambiguous syntax, ambiguous terms, vagueness, and general lack of clarity.

*Id.* at 243 n.2. Based on these standards, we disagree with the district court's conclusion that the termination provision of the consulting agreement is unambiguous.

It is clear from the first sentence of the termination paragraph that either side can terminate the agreement without cause upon proper notice. The ambiguity is created by the first phrase of the second sentence: "In the event of such termination." Does that mean termination by either party, referencing back to the termination discussed in the first sentence? If that is the true meaning, then Mr. Wilcox could terminate the agreement and still get paid the "remaining balance of the compensation." This was the conclusion of the district court.

Or does the phrase "[i]n the event of such termination" contemplate only termination by Barber-Colman upon proper notice, in which case Mr. Wilcox gets paid only if Barber-Colman terminates but not if he does? This interpretation

6

makes some sense given other language in the contract.      *See Nearburg v. Yates Petroleum Corp.*  , 943 P.2d 560, 570 (N.M. Ct. App. 1997) ("In interpreting a contract, the court must consider the contract as a whole and give significance to each part.").

In the first paragraph, Barber-Colman promises to use the services of Mr. Wilcox for management and technical direction; in paragraph three, Barber-Colman promises to pay Mr. Wilcox "for services rendered" according to the compensation package specified in an attached schedule; Mr. Wilcox promises in paragraph four "to serve faithfully and exclusively to the best of his ability, energy, skill and specialized knowledge . . . ."  Appellant's App. Vol. I at 41.

Additionally, the "wilful misconduct" language at the end of the second sentence is difficult to understand in the context of termination by Mr. Wilcox. If "such termination" in the first phrase of the second sentence is read as termination by either party, and if the defendant corporation were somehow guilty of "wilful misconduct," then Mr. Wilcox would not be entitled to the remainder of the compensation due if he were to terminate--surely an incongruous  result.  In that context, the termination referred to in the last phrase of the second sentence seems to refer only to termination of Mr. Wilcox by Barber-Colman.

Because the phrase, "in the event of such termination," is "susceptible to reasonable but conflicting meanings," *see C.R. Anthony*, 817 P.2d at 243, we hold that it is ambiguous under New Mexico law and that the district court erred in determining it to be otherwise.

Having found the term to be ambiguous, it is now the province of a fact-finder to determine the meaning of the termination provision. *See Mark V, Inc.*, 845 P.2d at 1235. Had there been no conflicting evidence regarding the circumstances surrounding the execution of the agreement, the court would be free to determine the meaning of the termination provision as a question of law by resorting to grammar, syntax, and traditional canons of contract construction. *Id.* at 1236. Here, however, the record is replete with conflicting evidence from the parties regarding their intent in entering into the consulting agreement.

Plaintiff's evidence indicates that the intent of the parties was to ultimately pay the Wilcoxes $6,000,000 for DataTalk so that they could realize approximately $4,000,000 after taxes. Appellant's App. Vol. II at 164-65, 170. One of defendant's employees, Mr. Armbrust, acknowledged that he knew Mr. Wilcox wanted $ 6,000,000 for his business, *id.* at 189-90, and would not consider selling for less than that, *id.* at 193. He also remembered that "putting those two events together" (presumably the stock purchase and the consulting agreement), would get Mr. Wilcox close to $6,000,000. *Id.* at 194. Mr. Wilcox's

8

evidence could further establish that when defendant could not come up with the $6,000,000 without approval from its board of directors, the parties crafted the consulting agreement as a vehicle to funnel additional monies to Mr. Wilcox. Vol. I at 100; Vol. II at 222, 227. The consulting agreement was simply another way of allocating funds to Mr. Wilcox that defendant could justify internally, Vol. I at 128, without a lengthy corporate approval process, Vol. II at 192-93. The sale of the business and the consulting agreement were tied together and represented a total package payment for DataTalk. Vol. I at 102; Vol. II at 172. Further, the letter of intent to sell the business provided that Mr. Wilcox would be employed by Barber-Colman for three years at $200,000 per year, Vol. I at 46, and that delivery of employment contracts for Mr. Wilcox and nine other engineers was part of Mr. Wilcox's consideration in the sale of DataTalk, *id.* Mr. Wilcox testified that he felt he could sign the consulting agreement and then immediately tender his resignation and still be paid the monies specified in the agreement. *Id.* at 55.

On defendant's side, the evidence is that Mr. Wilcox had to work as a consultant in order to be eligible for the monies specified in the agreement. *Id.* at 134. Barber-Colman wanted Mr. Wilcox to help with product development and to generally contribute to the business, *id.* at 52; Vol. II at 342, and specifically expected him to run the Albuquerque office during the term of the contract, *id.* at

9

197. All acquisitions by defendant had to be approved, not just those over $3,000,000, *id.* at 205, and defendant's president had not previously experienced problems from corporate superiors in exceeding $3,000,000 for an acquisition, *id.* at 93. The consultant fees contemplated in the agreement were not intended to compensate Mr. Wilcox for the share purchase. *Id.* at 233. Mr. Wilcox was to be paid for his services, *id.* at 336, and the second sentence of the termination paragraph was to protect him from being fired arbitrarily by Barber-Colman, *id.* at 342.

In summary, we hold that the termination paragraph of the consulting agreement is ambiguous and, because of the conflicting evidence in the record, the meaning of that paragraph must be resolved by a fact-finder. The judgment of the United States District Court for the District of New Mexico is REVERSED, and this case is REMANDED for further proceedings consistent with this order and judgment.

Entered for the Court

Deanell Reece Tacha
Chief Judge

10