# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>March 28, 2016</u>

**NO. 33,850**

**ELDORADO COMMUNITY IMPROVEMENT ASSOCIATION, INC.,**

      Plaintiff-Appellee,

v.

**SUSAN BILLINGS, DAVID BORTON, DEVRA BORTON, and ERIC WILSON,**

      Defendants-Appellants,

and

**GREG COLELLO, ROSE WINSTON, and GERSHON N. SIEGEL,**

      Defendants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mark A. Macaron, District Judge**

Cassutt, Hays & Friedman, P.A.
John P. Hays
Santa Fe, NM

for Appellee

VanAmberg, Rogers, Yepa, Abeita, Gomez & Works, LLP
Ronald J. VanAmberg
Santa Fe, NM

for Appellants

**OPINION**

**SUTIN, Judge.**

{1}   This case pits a subdivision association against several subdivision residents who keep hens as pets. The dispute is over a subdivision covenant that disallows "animals, birds, or poultry" on residents' lots unless kept as "recognized household pets." The subdivision association sued the defendant hen owners to rid their properties of hens. The defendants (the owners) claimed that their hens met the recognized household pet exception. On motions for summary judgment, the district court agreed with the subdivision association and required the owners to remove their hens from their lots. In this Opinion, we at times refer to "chickens" and to "hens" but we also use "poultry," because "poultry" appears in Section 11 of the subdivision covenants and because the parties concentrate on using "poultry" in their briefs. We hold that the restrictive covenant does not disallow the owners from keeping hens that are recognized as household pets and that the district court erred in requiring the owners to remove the hens.

**BACKGROUND**

{2}   Eldorado at Santa Fe Subdivision is a residential development located in Santa Fe County, New Mexico, and was established in 1972 with protective covenants. The 1972 covenants stated that their purpose "is to perpetuate . . . the rich qualities

peculiar to the pastoral environment for the benefit of all who acquire property within the Eldorado Ranch." The original 1972 covenants were replaced in 1996 by amended and restated protective covenants (hereinafter, the covenants) following a covenant election in 1995. The covenants state that their purpose, among other purposes, is to provide "an attractive rural setting for residential neighborhoods and home sites" and to encourage "individual expression consistent with the historical traditions of the region." The plaintiff here, Eldorado Community Improvement Association, Inc. (the association), has many subdivision-related administrative tasks, not the least of which is to enforce violations of the covenants.

{3}     At issue in this case is Section 11 of the covenants, which reads:

> Household pets. No animals, birds[,] or poultry shall be kept or maintained on any lot, except recognized household pets which may be kept thereon in reasonable numbers as pets for the pleasure and use of the occupants but not for any commercial use or purpose. It is forbidden to permit dogs to run at large in Eldorado. At all times, dogs must be kept, restrained[,] and controlled by their owners in the manner described in the Santa Fe County Animal Control Ordinance. A maximum of two horses may be kept on any lot which has an area in excess of three acres and which has been properly designated, pursuant to these covenants, as a horse area on any recorded subdivision map or by majority vote of the Board of Directors. A stable for such horses may be erected upon such lot.[1]

---

[1] The pertinent 1972 covenant provision regarding pets reads: "No animals, birds[,] or poultry shall be kept or maintained on any lot, except recognized household pets which may be kept thereon in reasonable numbers as pets for pleasure and use of the occupants but not for any commercial use or purpose. Notwithstanding

2

No other section in the covenants has any direct bearing on keeping animals, birds, or poultry on residential lots.

{4}     Section 11 forbids residential lot owners from keeping poultry on residential lots in the subdivision. At the same time, Section 11 provides an exception that permits poultry as well as animals or birds to be kept on residential lots under certain conditions, namely, as long as the poultry are "recognized household pets . . . for the pleasure and use of the occupants[,]" kept on the lot in reasonable numbers, and "not [kept] for any commercial use or purpose." There exists no issue here as to number of hens or as to commercial use or purpose. Nothing in Section 11 gives free reign to expansive poultry operations and no issue exists as to any such use here.

{5}     Both sides filed motions for summary judgment. Neither side argued that genuine issues of material fact existed that would preclude summary judgment. The district court determined that "[t]he terms 'recognized household pets' are not defined in the covenants and are not clear on their face[,]" in part because "[a] substantial number of homeowners and persons associated with the Eldorado Subdivision have disagreed for years about the meaning of the covenant language in issue." As to interpreting the critical, ambiguous words, the district court determined that chickens

the foregoing, a maximum of two horses may be kept on any lot which has an area in excess of three acres and which may be designated by [Eldorado at Santa Fe, Inc.] as a horse area, and a stable for such horses may be erected upon such lot."

were not recognized household pets and could not be kept or maintained on any lot in the subdivision. The court granted the association's motion and ordered the owners to remove their chickens from their properties. The owners appeal. More facts will appear in the discussion that follows.

**DISCUSSION**

**Standard of Review**

{6}     Because there exists no genuine issue of material fact, by agreement of the parties and determination by the district court, we are relieved of a burden of concern about the existence of such an issue. "Interpretation of language in a restrictive covenant is a question of law that we review de novo." *Estates at Desert Ridge Trails Homeowners' Ass'n v. Vazquez*, 2013-NMCA-051, ¶ 11, 300 P.3d 736; *Heltman v. Catanach*, 2010-NMCA-016, ¶ 5, 148 N.M. 67, 229 P.3d 1239.

**Definitions**

{7}     Because the issues in this case focus on the meaning of certain covenant terms, we begin with definitions. A "bird" is "any of a class . . . of warm-blooded vertebrates distinguished by having the body more or less completely covered with feathers and the forelimbs modified as wings." *Merriam-Webster's Collegiate Dictionary* 125 (11th ed. 2005). A "chicken" is a "common domestic fowl[.]" *Id.* at 213; *Oxford Dictionaries*, www.oxforddictionaries.com/us/definition/american_english/chicken

4

("A domestic fowl kept for its eggs or meat[.]"). A "hen" is "a female chicken[.]" *Merriam-Webster's Collegiate Dictionary* 580; *Oxford Dictionaries*, www.oxforddictionaries.com/us/definition/american_english/hen ("A female bird, especially of a domestic fowl."). A "fowl" is a "bird of any kind[.]" *Merriam-Webster's Collegiate Dictionary* 495; *Oxford Dictionaries*, www.oxforddictionaries.com/us/definition/american_english/fowl ("A gallinaceous bird kept chiefly for its eggs and flesh[.]"). Chickens are poultry. *See Merriam-Webster's Collegiate Dictionary* 972. "Poultry" are "domesticated birds kept for eggs or meat[.]" *Id.*; *Oxford Dictionaries*, www.oxforddictionaries.com/us/definition/american_english/poultry (defining "poultry" as "[d]omestic fowl, such as chickens, turkeys, ducks, and geese."). Finally, "a domesticated animal kept for pleasure rather than utility" and "kept for companionship or pleasure" is a pet. *Merriam-Webster's Collegiate Dictionary* 926; *Oxford Dictionaries*, www.oxforddictionaries.com/us/definition/american_english/pet (defining "pet" as "[a] domestic or tamed animal kept for companionship or pleasure"). The parties do not spar much over what a "pet" is. The definitions do not state that pets cannot also have utility. For purposes here, hens kept as a source of eggs are poultry, and hens also kept as a source of companionship or pleasure can be a pet. It is manifestly unclear, however, what "recognized" means.

5

**The District Court's Decision**

{8} We commend the district court for favoring the parties with a detailed letter decision that included procedural history, arguments, applicable law, legal analyses, evidence including historical facts, and the court's analyses and interpretations and views about the covenants and the words in Section 11. It is from the court's letter decision that the association primarily hinges its arguments.

{9} The district court cited our Supreme Court's four unchanged rules for interpreting restrictive covenants set out in *Hill v. Community of Damien of Molokai*, 1996-NMSC-008, ¶ 6, 121 N.M. 353, 911 P.2d 861. "[I]f the language is unclear or ambiguous, [the appellate courts] will resolve the restrictive covenant in favor of the free enjoyment of the property and against restrictions." *Id.* The appellate courts "must interpret the covenant reasonably, but strictly, so as not to create an illogical, unnatural, or strained construction." *Id.* We "will not read restrictions on the use and enjoyment of the land into the covenant by implication." *Id.* We "must give words in the restrictive covenant their ordinary and intended meaning." *Id.* These rules constitute "our four rules for construing restrictive covenants[.]" *Sabatini v. Roybal*, 2011-NMCA-086, ¶ 13, 150 N.M. 478, 261 P.3d 1110. "Failure to apply the rules of construction [of restrictive covenants] is an error of law." *Id.* ¶ 7.

**{10}**      Although it explicitly acknowledged the four *Hill* rules of interpretation, the district court focused its attention on an analysis in *Agua Fria Save the Open Space Ass'n v. Rowe*, 2011-NMCA-054, 149 N.M. 812, 255 P.3d 390, in which this Court held that "extrinsic evidence is admissible to explain or clarify, but not to vary or contradict, a restrictive covenant's terms." *Id.* ¶ 21. The district court stated that *Agua Fria*'s approach did not obligate the courts to apply the rule of strict construction in resolving a factual dispute regarding the restrictive covenant's meaning.

**{11}**      In the district court, relying on *Agua Fria*, the association focused on a view that the covenant language in question unambiguously set a community-wide standard as to what is a "recognized household pet"—meaning the standard must "come from the Eldorado community through the [d]emocratic process of amending the [c]ovenants[.]" Although, at the same time, the association broadened this standard to a "broader society" standard and offered testimony about the pet chicken trend nationally. The association alternatively argued that if the district court found an ambiguity, the affidavits and evidence offered from individuals in the local and national community supported a finding that "a chicken is . . . not a recognized household pet" and that, although "[p]eople may like them [and] they want to have them as pets[,] . . . it doesn't meet the standard in this community."

7

{12} The district court ultimately agreed with the owners that the phrase "recognized household pets" was not defined in the covenants and was unclear on its face. However, upon determining that the covenant was ambiguous, the district court looked to *Agua Fria* and in doing so went beyond our Supreme Court's interpretative rules for determining restrictive covenant meaning. *Agua Fria* states that extrinsic evidence can be admitted to explain or clarify a restrictive covenant's terms to obtain contextual understanding and holds that "a court may hear evidence of the circumstances surrounding the making of the contract and any relevant usage of trade, course of dealing, and course of performance." 2011-NMCA-054, ¶ 20 (internal quotation marks and citation omitted). *Agua Fria* also states that the Supreme Court's "rule of strict construction must be subordinate to the intention of the parties as reflected by the language of the whole instrument, the circumstances surrounding the transaction, and the purposes animating the restrictions" and that the rule favoring free enjoyment and against restrictions "cannot be applied to defeat the obvious purpose of the restrictions." *Id.* ¶ 18 (internal quotation marks and citation omitted). *Agua Fria* holds that, when interpreting restrictive covenants, "[t]he intent of the parties . . . govern[s]." *Id.* (internal quotation marks and citation omitted).

{13} To animate these additional rules of interpretation, *Agua Fria*, which addressed the propriety of a grant of summary judgment, relied on a view that restrictive

8

covenants are contracts and are to be interpreted under the rules of contract interpretation set out in *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶¶ 12-18, 112 N.M. 504, 817 P.2d 238, and *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶¶ 9-13, 114 N.M. 778, 845 P.2d 1232. The *Agua Fria* Court felt free to consider extrinsic evidence to explain the purposes and contextual understanding underlying restrictive covenants as though the covenants were a contract. *Agua Fria*, 2011-NMCA-054, ¶¶ 20-21. It felt free, then, to consider evidence surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. *Id*. And the *Agua Fria* Court concluded that "the courts are not obligated to apply the rule of strict construction . . . regarding [a] restrictive covenant's meaning." *Id*. ¶ 21.

{14} The district court in the case now before us treated the covenants as a contract and called on the contract interpretation rules stated in *Agua Fria*, *Mark V*, and *C.R. Anthony*. In granting summary judgment, the district court concluded that the owners' interpretation of Section 11 was "inconsistent with the uniformity contemplated by the covenants" and would "create an illogical result[.]" The district court determined that the owners' interpretation would "render the covenant meaningless" and was "inconsistent with the intent and purposes of the covenants when analyzed under the modern rule of construction and results in foreseeable illogical results when analyzed

under the general rule of construction." In addition, the district court expressed concern that "[c]onstruing the covenant to allow individual owners complete freedom to designate any creature they want as a household pet would frustrate the purposes of the covenants and create a dangerous precedent leaving other property owners without [any] recourse (unless it was a nuisance under the covenants)." Furthermore, the court determined that the owners' interpretation "would open the door to an unlimited multitude of different kinds of creatures being kept inside and outside of homes . . . without regulation or control under the covenants (except nuisances) leaving the other homeowners without recourse." These determinations were significantly driven by the association's extrinsic evidence offered to uncover the covenants' original meaning.

**The Evidence**

{15}   The district court considered the developer's 1972 covenants and even considered the reputation of the subdivision in the 1970s and 1980s. It considered evidence that the association historically viewed the covenant not to permit chickens—a history, as explained by the court, that indicated that chickens had not been considered by the association as recognized household pets and that the association had historically taken enforcement action against individual owners who had chickens on their property. Also, according to the court, no historical evidence

existed that chickens or other livestock had been contemplated by the developer or accepted by the association as allowable.

{16} The association's evidence in major part consisted of affidavits. William Donohue, who was general manager of the association beginning in 2006, provided an affidavit and documents relating to what the association's "policy and practice" was and had been. He also reported on the association's planning and enforcement activities, on its grants of variances, and on holding an election on proposed alternative covenant amendments. Mark Conkling, who served as manager of the association from 1987 to 1995, as a member of the association's architectural committee, and as a member of the association's board of directors, also provided an affidavit. Conkling was one of the first home builders in the subdivision and provided some information in his affidavit subject to valid hearsay, speculation, and lack of foundation objections.

{17} In the owners' view, even were the foregoing extrinsic evidence allowable, any opinion of the current association board or past boards, any surmised intent of the original developer in 1972, any surmised intent of voters in 1995 apart from the language in the covenant, and any hearsay evidence presented by a subdivision home builder, constituted elusively speculative and fleeting evidence. Specifically, this evidence consisted of unreliable factors that were changeable at any given time due

11

to changes in association membership and residential makeup and depending on who at any given time might be interpreting Section 11, with contrary views always present. According to the owners, even if allowable, the extrinsic evidence could not support an interpretation that Section 11 flatly forbids hens.

{18} The association also presented an affidavit of Dr. Kristy Pabilonia, an associate professor and diagnostic veterinarian at Colorado State University, and an expert in commercial poultry populations and backyard poultry flocks, both rural and urban. Dr. Pabilonia discussed disease found in flocks and opined as to the classification of backyard poultry flocks. She stated that "[p]oultry has not historically been considered 'household pets,' and traditional household pets, such as dogs and cats, are not regulated as agricultural animals by the USDA." She further stated that her scientific surveys of owners of backyard poultry flocks showed that 86% maintained chickens as a source of food, meat, or eggs, and that 42% maintained chickens as pets, companions, or hobby animals. In addition, she stated that "keeping backyard poultry flocks for any purpose, including as a source of food, meat[,] or eggs, or as hobby animals, has become a significant phenomenon only within the past ten years [or] so, since the mid-2000s." The district court concluded that "[t]his significantly indicates that in broader society[,] chickens are not recognized as household pets by most."

{19} The district court also found to be significant the vote in a subdivision-sponsored election held in 2012, relating to two proposed changes to Section 11 language, one allowing chickens and one not allowing chickens. Presumably based on the association arguments that by a vote of 55.4% to 44.6% the *voting* homeowners rejected the proposed covenant amendment that would have specifically allowed chickens under the Section 11 definition of "household pets," the court concluded that the voting homeowners of the subdivision voted not to include chickens within the meaning of "household pets" under the covenant language.

{20} The owners describe the election differently. In their view, the association's arguments fail because the covenants require that 50% plus one of all subdivision property owners had to vote in favor of an amendment for it to be enacted. The owners show that of the total of subdivision property owners, only 35.07 % voted for a covenant that would expressly forbid hens; 29.99% voted for a covenant that would expressly allow residents to keep pet hens on their property; leaving 35.04% of the subdivision residents who did not vote. The vote was therefore insufficient under the covenants for any amendment to be adopted, and the election left in place the original acknowledged ambiguity. Therefore, the owners argue that the election was an "ad hoc inconclusive opinion poll[]" having no bearing on covenant interpretation.

13

**The Covenant Must Be Construed to Favor the Owners**

{21} The notions expressed in the covenants of maintaining the "pastoral" and "rural" nature of the area and the historical traditions of the region would appear to lend themselves to allowing animals, birds, and poultry as recognized pets. If the Eldorado community did not want poultry because poultry were not recognized as household pets, it is reasonable to assume that the residents would have removed the language that anticipates and permits poultry as household pets. We do not think that it is reasonable to read the language of Section 11 to reflect an intent that the only way poultry could be "recognized" as household pets was if the association or a large number but less than a majority of lot owners recognized poultry as such.

{22} We agree with the district court that the covenant language was unclear and ambiguous. Ambiguity is created when provisions are reasonably and fairly susceptible to different constructions. *Levenson v. Mobley*, 1987-NMSC-102, ¶ 7, 106 N.M. 399, 744 P.2d 174. In light of the ambiguity, the district court should have applied the reasoning in *Hill*, which addressed a restrictive covenant governing use, not the reasoning in *Agua Fria*, which addressed an ambiguity in a landowner's ability to extinguish restrictive covenants under a saving clause in restrictive covenants. The ambiguity was not in any particular restrictive covenant as to use. We see no reasonable basis in the case presently before us on which to treat enforcement

14

of the covenants governing the use of lots as a contract to be governed by the rules and approach used in *Agua Fria*. *Hill*, rather than *Agua Fria*, governs this case. The facts here and in *Hill* differ significantly from the facts in *Agua Fria*. *Agua Fria* did not resolve an ambiguity in a covenant governing use. And restrictive use covenants involve valuable property rights and extrinsic evidence should not provide the basis for interpretation of those covenants.

{23}    In *Agua Fria*, the issue on appeal was whether, as a matter of law, the defendant developer had properly extinguished restrictive covenants on a tract of undeveloped land (the country club tract) pursuant to a "saving clause." 2011-NMCA-054, ¶¶ 2-9. The plaintiff in *Agua Fria* argued that the extinguishment provision in the saving clause did not apply to the country club tract, and thus, the developer should not have been permitted to extinguish restrictive covenants. *Id.* ¶¶ 9, 14. This Court ultimately determined that the saving clause was ambiguous as applied to the tract, *id.* ¶ 17, and then proceeded to analyze the saving clause pursuant to contract law. *Id.* ¶¶ 18-25. The *Agua Fria* opinion's broad swath of contract interpretation of ambiguous restrictive covenants could not have purposely been intended to apply to restricted land use. The extinguishment provision in the saving clause did not and was not intended to place any additional restrictions on the use of land. *Agua Fria* is therefore significantly distinguishable. To that end, we firmly side

15

with a view that the meaning of ambiguous restrictive use provisions should be tested under the *Hill* qualifiers and not under contract interpretation rules.

{24}     We suspect that the interpretive variances between *Agua Fria* and *Hill* stem from the types of issues that the parties sought to resolve. In *Hill*, our Supreme Court considered whether a group home constituted "residential use" of a property and whether the individuals in the group home were a "single family" as required by the restrictive use covenant. 1996-NMSC-008, ¶¶ 7-21. The Court rightly held that, when ambiguous, covenants restricting the use of land should be resolved in favor of free use. *Id.* ¶ 6. In applying its test, the Court was able to fully resolve the issues in favor of the property owners. *Id.* ¶¶ 11, 21, 52. In *Agua Fria*, however, *Hill*'s test likely would not have fully resolved the matter because the dispute was not direct with regard to the use of land. Because the covenant at issue in *Agua Fria* dealt with a party's ability to extinguish covenants, *Hill*'s factors regarding free enjoyment of the property and restrictions by implication would not have translated and would not have guided the Court in *Agua Fria* to a clear resolution. Here, application of the *Hill* factors alone can and does resolve the issue.

{25}     Further, it is important to keep in mind that restrictive "covenants constitute valuable property rights of the owners of all lots in the tract." *Montoya v. Barreras*, 1970-NMSC-111, ¶ 12, 81 N.M. 749, 473 P.2d 363. Reliance on restrictive covenants

16

is a valuable property right. *Wilcox v. Timberon Protective Ass'n*, 1990-NMCA-137, ¶ 42, 111 N.M. 478, 806 P.2d 1068, *abrogated on other grounds by Agua Fria*, 2011-NMCA-054, ¶ 22. Thus, the rules set out by our Supreme Court in *Hill* are controlling in the case before us. *See Hill*, 1996-NMSC-008, ¶ 6. The *Hill* interpretative rules have been fully recognized by this Court. *See Sabatini*, 2011-NMCA-086, ¶¶ 7-10; *see also Wilcox*, 1990-NMCA-137, ¶ 18 (acknowledging a four-part test applies to restrictive covenants); *cf. Mayer v. Smith*, 2015-NMCA-060, ¶ 17, 350 P.3d 1191 (stating that "[t]his Court has established a distinction between contract interpretation and easement interpretation with regard to extrinsic evidence").

{26}     What the developer may have had in mind, how individual association members over time may have viewed the language, whether the association over time successfully enforced Section 11 without court assistance, and any "community" or "broader society" sense of Section 11's meaning, constitute fleeting and speculative proof of meaning in this case, as did that of Dr. Pabilonia regarding when the advent of chickens as pets may have emerged in contemporary society. Dr. Pabilonia actually confirmed that a substantial percentage of chicken owners keep chickens as pets.

{27}     We therefore disagree that Section 11 disallows hens that can be and are treated as pets. And we disagree that to allow hens as household pets creates or opens up any likely circumstances of ruination as expressed by the association and the district court

that warrants an interpretation that allowing the hens as pets could never have been intended at any time and under any circumstance. We are not persuaded that in permitting pet chickens "the sky will fall." Such a Chicken Little-esque view of possible results and calamity is not convincing. We also disagree with an interpretation that whether hens may be permitted depends on a majority vote of the members of the association or on a vote of some particular number below 50% of voting lot owners. If the association or the lot owners of the subdivision want a different result, the lot owners must effectuate the change through the required covenant amendment election process set out in the covenants.

**CONCLUSION**

{28}   Section 11 of the covenants cannot be enforced under the circumstances in this case to preclude the owners from keeping their hens as recognized household pets. We reverse the judgment of the district court.

{29}   **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**LINDA M. VANZI, Judge**

_____
**J. MILES HANISEE, Judge**

18