**Certiorari Denied, January 6, 2010, No. 32,003**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-016**

**Filing Date: August 27, 2009**

**Docket No. 28,613**

**HARRIET HELTMAN,**

      **Plaintiff-Appellee,**

**v.**

**ALBERT F. CATANACH, JR.,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Timothy L. Garcia, District Judge**

Sawtell, Wirth & Biedscheid, P.C.
Bryan P. Biedscheid
Santa Fe, NM

for Appellee

Albert F. Catanach, Jr.
Santa Fe, NM

Pro Se Appellant

**OPINION**

**VANZI, Judge.**

**{1}**    Defendant appeals from an order enjoining him from subdividing his property and building a single-family residence on the resulting lot. The district court's order was based on the terms of a restrictive covenant governing the use of the lots in Defendant's subdivision. Defendant raised two equitable defenses to the enforcement of the covenants, but the district court concluded that the evidence did not warrant nonenforcement. As we conclude that the district court erred in refusing to consider relevant evidence in evaluating Defendant's equitable defenses, we reverse and remand

1

for a new trial on the issue of whether those defenses should prevent enforcement of the covenants against Defendant in this case.

## BACKGROUND

**{2}** Plaintiff, Harriet Heltman, and Defendant, Albert Catanach, are the owners of separate residential lots in the Lovato Subdivision No. 1 in Santa Fe, New Mexico (the City). In January 2004, Defendant applied to the City for approval to split his lot. Defendant's home was already positioned on part of the lot, and he hoped to build a residential structure on the resulting new lot after the split. Soon after Defendant filed his application with the City, Plaintiff initiated this lawsuit seeking a declaratory judgment that Defendant's proposed use of the property would violate the restrictive covenants governing the subdivision and seeking an injunction to prevent Defendant from subdividing his lot and building a residence on the resulting lot. In the district court, the parties disputed which of several sets of restrictive covenants actually governed the subdivision, whether the restrictive covenants barred Defendant's proposed use of his property, and whether Defendant's affirmative defenses prevented enforcement of the covenants against him. After a bench trial, the district court entered a judgment declaring that Defendant's proposed subdivision of his lot and construction of a residential structure on the resulting lot would violate the governing restrictive covenants. The district court enjoined Defendant from carrying out his plans.

## DISCUSSION

**{3}** Defendant appeals, arguing: (1) that the district court erred by applying the wrong set of covenants; (2) that even if the district court relied on the correct covenants, those covenants do not expressly prohibit subdivision of Defendant's lot; (3) that the district court erred in limiting the scope of evidence it would consider as relevant to Defendant's affirmative defenses; and (4) that the district court erred in concluding that Defendant's affirmative defenses did not prevent the enforcement of the covenants against him in this case.

### The 1940 Covenants Are Controlling

**{4}** The Lovato Subdivision was originally controlled by a set of restrictive covenants that was recorded in 1936. A second set of covenants purporting to supercede the 1936 covenants was recorded in 1940. In 2005, after this litigation had commenced, Defendant recorded an agreement among a majority of property owners in the subdivision to modify the covenants. Subsequent to Defendant's recorded amendment, Plaintiff recorded her own amendment. The district court determined that the 1940 covenants were applicable to the subdivision and that, to the degree either Defendant's or Plaintiff's amendments were effective, they would not actually take effect until the year 2015. Defendant asserts that the district court erred in applying the 1940 covenants and claims that either the 1936 covenants or his 2005 amendments should control.

**{5}** A determination of which set of covenants is applicable required the district court to interpret the covenants themselves—a legal determination that this Court reviews de novo. *See Baker v. Bennie J. Aday & Dixie J. Aday Revocable Trust*, 1999-NMCA-123, ¶ 9, 128 N.M. 250, 991 P.2d

2

994 (applying de novo review to the district court's interpretation of the terms of a covenant). The 1936 covenants provided that they were to "remain in force until July 1, 1960, and thereafter until such time as the same may be modified or abrogated by a vote of two thirds of the owners of lots within said subdivision." Defendant argues that since the 1940 covenants were recorded prior to July 1, 1960, they were ineffective because they violated the plain meaning of the 1936 covenants' requirement that no amendment take place prior to that date. Plaintiff points out that there was evidence that the 1940 covenants were recorded by unanimous agreement of all the then-owners of the Lovato Subdivision and argues that because it was unanimous, the amendment was effective.

{6}     We agree that the unanimous agreement in 1940 of all the then-owners of the property in the subdivision was effective to amend the 1936 covenants. Generally, the "obligation of the burdened party under a covenant can be extinguished by action by the person entitled to enforce the covenant." Gerald Korngold, *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes* § 11.03, at 386 (1990). "Termination by release or agreement is based on fundamental principles of contract law, as one entitled to enforce a promise may relieve the promisor of his or her obligation." *Id.* at 386-87. "As a corollary to the rule that a covenant can be terminated by the agreement of the parties, a covenant may be amended upon agreement of the parties. Under the general rule, all of the parties entitled to enforce the covenant must agree to the amendment." *Id.* § 11.13, at 419 (footnote omitted).

{7}     Where a provision such as the one in the 1936 covenant provides that a covenant shall remain in effect for an initial period, after which it may be modified by less than unanimous consent, courts have interpreted these provisions to simply provide an exception, after a certain number of years, to the general rule that unanimity is required in order to amend a restrictive covenant. *See, e.g.*, *Johnson v. Howells*, 682 P.2d 504, 505 (Colo. Ct. App. 1984) (holding that the district court erred in concluding that the covenant could be amended by sixty percent of the property owners prior to the expiration of the initial twenty-year period and stating that amendment during this period could only be effected by unanimous consent); *Kauffman v. Roling*, 851 S.W.2d 789, 794 (Mo. Ct. App. 1993) (interpreting such a provision to mean that the covenant could be amended during the initial period only by unanimous consent, but could be subsequently amended by the two-thirds majority provided for in the covenant).

{8}     Defendant has cited no authority to support his claim that the then-owners of the properties in the Lovato Subdivision could not unanimously agree to enact the 1940 covenants, thereby amending the 1936 covenants. Accordingly, we assume that there is none. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). And while we have no quarrel with the case cited by Defendant for the proposition that under a similar provision a covenant cannot be modified by less than unanimous consent during the initial period, *see White v. Lewis*, 487 S.W.2d 615, 616 (Ark. 1972), that is not what occurred here. We hold that the unanimous agreement of the then-owners of the properties in the subdivision amended the 1936 covenants and replaced them with the 1940 covenants.

3

**{9}** Defendant asserts that even if the 1940 covenants were valid, the amendments he recorded in May 2005 with the signatures of a majority of the owners were effective to amend the 1940 covenants. With regard to amendments, the 1940 covenants provide:

> These covenants are to run with the land and shall be binding on all the parties and all persons claiming under them until January 1, 1965, at which time said covenants shall be automatically extended for successive periods of ten years unless by a vote of the majority of the then[-]owners of the lots it is agreed to change the said covenants in whole or in part.

The district court determined that under this provision, Defendant's amendments would not go into effect until January 1, 2015. We conclude that the district court was correct that Defendant's amendments—to the degree they were validly enacted and not superceded by Plaintiff's subsequently recorded amendments—would not go into effect until January 1, 2015. We base this conclusion on the duration clause specifying that extensions of the covenant are to last for ten-year periods.

**{10}** Restrictive covenants "are to be read reasonably but strictly and, to the extent language is unclear or ambiguous, the issue of enforcement of a restriction will be resolved in favor of the free enjoyment of the property and against limitations." *Mason Family Trust v. DeVaney*, 2009-NMCA-048, ¶ 9, 146 N.M. 199, 207 P.3d 1176. Defendant contends that the covenant is unambiguous and that the language providing that after January 1, 1965, the covenants "shall be automatically extended for successive periods of ten years unless by a vote of the majority of the then[-]owners of the lots it is agreed to change the said covenants in whole or in part," means that after January 1, 1965, a majority of owners could agree to modify the covenants at any time. We disagree. While we recognize that Defendant's proposed interpretation has some logical force, since the covenant provides that the ten-year extensions will remain in place *unless* the majority chooses to modify them, to interpret the language as Defendant proposes would render meaningless the portion clearly providing that extensions of the covenant would be for ten-year periods. Defendant effectively asks this Court to interpret the language as if it simply reads that the covenants "shall be automatically extended unless by a vote of the majority of the then[-]owners of the lots it is agreed to change the said covenants in whole or in part." He does not explain what purpose the specific ten-year duration clause would serve under such an interpretation, and we can think of none. Therefore, we do not find this provision to be as clear as Defendant asserts. Nevertheless, we conclude that this is not a case in which the rule of construction favoring the unencumbered use of property should apply. This Court "will not construe a deed restriction so as to create an illogical, unnatural, or strained construction," and "[w]e will give words in a deed restriction their ordinary and intended meaning." *Id.* Applying these rules of construction, we decline to adopt a reading of this provision that eliminates the ten-year period for extensions that is plainly specified in the covenant.

**{11}** A number of other courts have interpreted similar language, and it appears that all but one have determined that modifications by less than unanimous agreement can only take place at the start of the next of the "successive periods of [ten] years." *See Swenson v. Erickson*, 998 P.2d 807,

815 (Utah 2000) (internal quotation marks omitted) (holding that an agreement that attempted to terminate a subdivision's restrictive covenants was ineffective, where the covenants specifically provided that they would be terminated by a majority vote of subdivision property owners only at specific ten-year intervals); *see also Scholten v. Blackhawk Partners*, 909 P.2d 393, 396-97 (Ariz. Ct. App. 1995) (holding that an otherwise valid amendment was ineffective until the beginning of the next ten-year period); *Mauldin v. Panella*, 17 P.3d 837, 839 (Colo. Ct. App. 2000) (holding that the district court erred in concluding that an amendment could be passed at any time, rather than at the beginning of the successive ten-year period); *In re Wallace's Fourth Southmoor Addition to the City of Enid*, 874 P.2d 818, 820-21 (Okla. Civ. App. 1994) (same). *But see Hill v. Rice*, 505 So. 2d 382, 385 (Ala. 1987) (holding that an amendment could be passed at any time after the initial period by the agreement of the specified majority, without addressing the purpose of the clause regarding the ten-year periods).

{12}   We agree with those courts that have concluded that "in order to give meaning to all of its provisions, we [must] hold that the duration clause requires that an amendment approved [by the specified majority, rather than unanimously] during the running of an extension period become[s] effective only at the start of the next successive period."  *Scholten*, 909 P.2d at 396.  Here, Defendant's May 2005 amendments came too late to meet the January 1, 2005 deadline, and therefore, if valid, would not take effect until January 1, 2015.  Accordingly, the district court correctly concluded that the 1940 covenants governed the subdivision property for purposes of this litigation.

**The 1940 Covenants Prohibit Defendant's Proposed Subdivision of His Property**

{13}   Defendant contends that the 1940 covenants "do not prevent subdivision [of his lot] and construction of an additional building on the subdivided lot."  We cannot agree.  Defendant's lot is .511 acres, and the proposed split would result in a .215-acre lot and a .294-acre lot, each with a single-family home on it.  Section 2(D) of the 1940 covenants provides that "[n]o residential structure shall be erected or placed on any building plot, which plot has an area of less than one half acre . . . ."  That provision clearly prohibits Defendant from dividing his lot into two lots that are less than one-half acre and maintaining a residential structure on each lot.

{14}   Defendant relies on two Illinois cases in support of his argument that the 1940 covenants do not prohibit the proposed use of his property in this case.  However, the cases are not persuasive because the language of the covenants in each is meaningfully different from the language in the 1940 covenants.  In *Sadler v. Creekmur*, the covenant stated that "[n]o building shall be erected . . . or permitted to remain on any lot other than one single family dwelling . . . ."  821 N.E.2d 340, 343 (Ill. App. Ct. 2004) (internal quotation marks omitted).  The Illinois Appellate Court held that this language did not prohibit an owner from subdividing his lot and building a second residence on the resulting half of the subdivided property.  *Id.* at 348.  *Sadler* is clearly distinguishable, since there, the covenant did not define the term "lot" or place any acreage requirements on land used for placement of a residential structure.  *Id.* at 343.

**{15}** In *Paquette v. Coble*, the restrictive covenant provided that "[n]o more than one single family residence or dwelling house shall be built or erected upon any piece or parcel of the above premises, having an area of less than two and one-quarter acres." 653 N.E.2d 1262, 1264 (Ill. App. Ct. 1995) (internal quotation marks omitted). The plaintiffs sought to subdivide a lot that was approximately 2.07 acres. *Id.* The Illinois Appellate Court held that, since there was nothing in the covenant providing for a minimum residential lot size, the covenant did not prohibit subdivision of the lot, and instead only limited the number and type of structure that could be built on the resulting new parcel if it was less than two and a quarter acres. *Id.* at 1265-66. Therefore, subdivision of the lot was permitted, so long as only no more than one single-family dwelling was built on the resulting lot. *Id.*

**{16}** Here, in contrast to *Sadler* and *Paquette*, the 1940 covenants do provide for a minimum residential lot size, since they prohibit the construction of a residential structure on any lot smaller than one-half acre. As Defendant's proposed subdivision would result in two lots smaller than one-half acre, each with a single-family residence, the 1940 covenants prohibit Defendant's proposed use of his property.

**Evidence of Other Covenant Violations Is Relevant to Defendant's Defense of Changed Conditions**

**{17}** Even though we hold that the 1940 covenants expressly prohibit Defendant's proposed use of his property, New Mexico law recognizes that there are certain circumstances under which it is inequitable to enforce a restrictive covenant. In the district court, Defendant asserted that it would be inequitable to enforce the covenants against him because of changed conditions of the neighborhood. Restrictive covenants "have historically been used to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability." *Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 9, 138 N.M. 477, 122 P.3d 844 (internal quotation marks and citation omitted). In some cases, when that uniformity has been destroyed by other violations of a covenant or when other changes in the neighborhood have undermined the original purpose of the covenant, the covenant may be set aside. *See id.* ¶ 13. In order to warrant setting aside the covenant, "the degree of change must be so significant and so radical as to frustrate the original purpose of the grantors such that the original intent can no longer be carried out." *Id.*

**{18}** The 1940 covenants are generally directed at ensuring that the subdivision contains only single-family residences on lots that are at least one-half acre. The relevant sections of the 1940 covenants provide:

> [2(A)] All lots in the tract shall be known and described as residential lots. No structures shall be erected, altered, placed or permitted to remain on any residential building plot other than one detached single-family dwelling not to exceed two stories in height and a private garage for not more than three cars and other outbuildings, incidental to residential use of such tract.

. . . .

[2(D)] No residential structure shall be erected or placed on any building plot, which plot has an area of less than one half acre. . . .

. . . .

[2(G)] No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.

. . . .

[2(L)] Invalidation of any one of these covenants by judgment or court order shall in no [way] affect any of the other provisions which shall remain in full force and effect.

{19}    On the first day of the bench trial when the parties were offering their exhibits, Defendant indicated that most of his evidence related to the fact that a significant number of lots in the subdivision contained either (1) multifamily residences, (2) primary single-family residences with guest houses on the lots that were being used as additional single-family residences, rather than as temporary places for guests of the primary residences, or (3) non-residential structures, such as churches, all in violation of the covenants. The district court indicated that because Defendant wanted to split his lot into two parcels smaller than a half acre and with a residence on each in violation of Section 2(D), the only relevant evidence of changed conditions was whether there were other lot splits that resulted in lots smaller than one-half acre in violation of Section 2(D); evidence of multifamily dwellings and guest houses used as residences would only be evidence of violations of Section 2(A) or 2(G), which the district court did not consider to be relevant. Defendant explained that he believed that evidence of the multifamily dwellings and the guest houses was relevant to his defenses because this evidence demonstrated that many of the lots in the subdivision contained more than one residence per half-acre lot. Defendant argued that reading the 1940 covenants as a whole, it is clear that the purpose is to ensure that there is only one single-family residence per half-acre lot, and that this intent had not been followed in much of the subdivision, such that the covenant should not be used to bar him from subdividing his lot and placing a second single-family residence on it. The district court stated that it did not see a connection between the provision governing the number of single-family residences on a lot and the provision governing the size of each lot. As a result, the district court indicated that Defendant should not spend much time introducing evidence relating to the guest houses and multifamily dwellings.

{20}    After trial, in the district court's findings and conclusions, it found that there were "[s]everal guest houses, duplexes or other multifamily residences," as well as nonresidential buildings such as churches that had been built on lots in the subdivision, but that there had been only one lot split that resulted in two lots smaller than one-half acre. The district court found that the single lot split

7

did not significantly alter the character of the neighborhood so as to render the covenant unenforceable. It also found that while

> [t]he construction of numerous guest houses and other multifamily units on existing one-half (½) acre lots . . . would raise issues regarding the validity and enforceability of Section 2(G) of the 1940 Restrictive Covenants, . . . the severability provisions set forth in Section 2(L) . . . would prevent such violations from affecting the validity of the remaining covenants, specifically the one-half (½) acre minimum residential lot size requirement in Section 2(D) . . . .

We hold that the district court erred in so narrowly limiting the scope of the evidence it would consider in evaluating Defendant's argument regarding changed conditions.

{21}   Generally, when a court determines whether changed conditions will prevent a covenant from being enforced, it looks to all conditions relevant to the use of the property that is sought to be enjoined—not just to other violations of the same provision of the covenants. *See, e.g.*, *Mason v. Farmer*, 80 N.M. 354, 355-57, 360, 456 P.2d 187, 188-90, 193 (1969) (holding that changed conditions rendered it inequitable to enforce a restrictive covenant limiting a property to residential uses and relying in part on conditions other than the violation of the same provision of the covenant); *Mershon v. Neff*, 67 N.M. 311, 318, 355 P.2d 128, 132-33 (1960) (remanding to the district court to consider changes that included both violations of the relevant covenant and a factor not governed by the covenants—increased traffic); *Jones*, 2005-NMCA-124, ¶¶ 15-16 (considering evidence of factors not governed by the covenants—crime rates and neighborhood safety—in determining whether a wall height restriction should be enforced and concluding that there was insufficient evidence of a significant change in those conditions to warrant the district court's refusal to enforce the covenant). Although the district court concluded that the severability clause in the 1940 covenants controlled what evidence would be relevant to the issue of changed conditions, we find nothing in that clause to support such an interpretation, and neither of the parties has cited any authority that would suggest that a severability clause should be so interpreted.

{22}   In this case, where the covenants seek to ensure that all properties contain only a single-family residence on a lot of at least one-half acre, evidence that other properties had either multifamily residential structures, multiple residential structures on lots not large enough to provide at least one-half acre per residence, or nonresidential structures would be relevant to the question of whether it is equitable to enforce the covenants against Defendant in this case. Defendant's proposed use of his property would apparently result in a use that is consistent with the use of a significant number of other lots in the subdivision—more than one residence in an area of less than one-half acre per residence. Although Defendant's proposed use of the property is different from some of the other violating residential lots—since he intends to actually split his lot and place another residence on the resulting new lot, rather than simply placing an additional residence on the existing lot—in light of New Mexico case law indicating that the scope of evidence relevant to changed conditions is relatively broad, we cannot conclude that this difference warranted the district court's refusal to consider evidence of other violations that did not involve lot splits. The evidence of the use of the other lots possessing multifamily residences, multiple residential structures per lot,

or nonresidential structures was relevant to Defendant's claim of a changed condition, and the district court erred in declining to consider it for that purpose.

**Evidence of Plaintiff's Acquiescence in Other Covenant Violations Is Relevant to Defendant's Claim that Plaintiff Waived Her Right to Enforce the Covenant**

{23}    New Mexico courts have also recognized that a covenant should not be enforced by one who has acquiesced in prior violations of the covenant. *See Neff v. Hendricks*, 57 N.M. 440, 442-43, 259 P.2d 1025, 1026-27 (1953) (concluding that defendants had not waived by acquiescence their right to enforce the relevant covenants since prior violations had been minor and defendants had actively sought to enforce other violations of the restrictions). Waiver by acquiescence requires "a showing that the part[y] presently trying to enforce the covenant had previously acquiesced in a violation of the same or a different covenant on another restricted lot." Jay M. Zitter, Annotation, *Waiver of Right to Enforce Restrictive Covenant by Failure to Object to Other Violations*, 25 A.L.R. 5th 123, § 2[a] at 144 (1994). Relevant considerations, among others, include whether the party seeking to enforce the covenant had actual or constructive knowledge of the prior violations, the magnitude of the current violation as compared to prior violations, and whether the prior violations were temporary, occasional, or permanent. *Id.*

{24}    In the district court's findings and conclusions, it stated that Plaintiff's failure to prevent the single lot split that had occurred in the subdivision did not constitute acquiescence in the split sufficient to waive Plaintiff's ability to enforce the covenant against Defendant's proposed lot split in this case. The district court apparently did not consider Plaintiff's failure to enforce the covenants against the other violations of those provisions intended to ensure that each lot possesses only a single-family residence on a lot of a minimum of one-half acre. For the same reasons we have concluded that the evidence of the multifamily residences, multiple residences on a single lot, and nonresidential structures was relevant to the question of whether changed conditions prevented enforcement of the covenants against Defendant, we conclude that this evidence was relevant to the issue of whether Plaintiff had acquiesced in other relevant violations of the 1940 covenants, such that she should not be permitted to enforce the covenants against Defendant. *See Mason*, 80 N.M. at 359, 456 P.2d at 192 ("[W]e have recognized the importance of changed conditions and circumstances in deciding whether restrictive covenants have been waived, or should be enforced."); Korngold, *supra*, § 11.05, at 392-93 (noting that the question of waiver often involves a factual inquiry similar to that involved in the question of changed conditions).

{25}    Although often a party's acquiescence in the violation of one provision of a covenant will not constitute acquiescence in the violation of another provision, *see generally*, Zitter, *supra* (citing cases in which acquiescence to a violation of one provision in a covenant is held to not constitute acquiescence to another provision), here the provisions relating to lot size and to the number of dwellings per lot are all intended to achieve the same purpose: a residential community in which all properties contain a single-family dwelling on a lot with a minimum size of one-half acre. Therefore, evidence of Plaintiff's acquiescence in the properties containing multifamily residences, multiple residences, and nonresidential structures is relevant to whether it is inequitable to permit her to enforce the covenant in this case. *See* Restatement (Third) of Property: Servitudes § 8.3 cmt.

9

f at 501 (2000) ("Waiver usually involves a failure to object to other violations of the same *or similar* servitudes such that it would be unfair to allow the claimant to enforce the servitude against the current violation." (Emphasis added)). Therefore, the district court erred in failing to consider this evidence in determining whether Plaintiff acquiesced in these prior violations and, if so, whether such acquiescence should bar her from enforcing the covenants against Defendant in this case.

**CONCLUSION**

**{26}** Because we conclude that the district court erred in failing to consider certain evidence of other violations of the 1940 covenants as relevant to Defendant's equitable defenses of changed conditions and waiver by acquiescence, we reverse and remand for a new trial on those defenses.

**{27} IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**RODERICK T. KENNEDY, Judge**

**Topic Index for *Heltman v. Catanach*, No. 28,613**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-PR | Pro Se Representation on Appeal |
| AE-RM | Remand |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-EQ | Equitable Claims or Defenses |
| CP-WA | Waiver |
| | |
| **PR** | **PROPERTY** |
| PR-CN | Covenants |
| PR-RC | Restrictive Covenants |
| PR-SU | Subdivisions |