**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number:  2013-NMCA-086

Filing Date:  June 17, 2013

Docket No.  32,053

MARY LAWTON,

      Plaintiff-Appellant,

v.

RICHARD SCHWARTZ, JANE SCHWARTZ,
JAMES JOHNSTONE, BARBARA JOHNSTONE,
ALLAN RAFF, HARRIET M. RAFF,
ERROL LEVINE and JILL MEYERS,

      Defendants-Appellees,

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Barbara J. Vigil, District Judge**

Rubin Katz Ahern Herdman &
MacGillivray, P.A.
Frank T. Herdman
Jenny F. Kaufman
Santa Fe, NM

for Appellant

Long, Pound & Komer, P.A.
Nancy R. Long
Justin W. Miller
Santa Fe, NM

Hinkle Hensley Shanor & Martin
Thomas M. Hnasko
Dulcinea Z. Hanuschak
Santa Fe, NM

Todd M. Lopez
Santa Fe, NM

1

for Appellees

**OPINION**

**FRY, Judge.**

**{1}**     Plaintiff Mary Lawton appeals the district court's order granting Defendants' motion for summary judgment and dismissing her claims for injunctive relief.  Plaintiff filed suit attempting to enforce a provision of the Estancia Primera subdivision's (Subdivision) restrictive covenants (CCRs) that prohibited trees maintained within the Subdivision from interfering with homeowners' views.  Plaintiff primarily raises two issues on appeal.  First, Plaintiff argues that an amendment to the CCRs that terminated the view restriction was improper during the fifty-five year term of the CCR's duration clause.  Second, Plaintiff contends that the voting procedures utilized to adopt the amendment failed to comply with the amendment procedures of the CCRs.  Because we conclude that the CCRs are ambiguous and that the validity of the amendment should not have been determined as a matter of law, we reverse the district court's order.

**BACKGROUND**

**{2}**     Plaintiff is a homeowner in the Subdivision and a member of the Estancia Primera Community Services Association (Association).  In 1993, Plaintiff purchased a Subdivision lot situated on a small ridge with westerly views of the Jemez Mountains.  Plaintiff's home was designed to take advantage of these views and includes two portals off the western-facing living room and master bedroom.  In 2009, Plaintiff notified the Association's Architectural Review Board (ARB) that certain cottonwood trees on Defendants' properties were obstructing her view of the Jemez Mountains and requested that the Association remedy the situation either through extensive pruning or removal of the trees.

**{3}**     The Subdivision's original CCRs were recorded in 1982.  Since that time, the CCRs have been amended at least eight times.  Plaintiff originally rooted her challenge to the trees in Section 6.18 of the 2005 amended version of the CCRs.  Both the 1982 and 2005 versions of Section 6.18 provided, "No shrub, hedge, tree or other landscaping which interferes with the view, solar access and/or privacy of any [l]ot  . . . shall be planted, permitted or maintained on any Lot, Living Unit or Parcel or upon any Common Area."

**{4}**     The ARB initially denied Plaintiff's request to enforce the view restriction.  Plaintiff's appeal to the Association's board of directors was also unsuccessful.  In July 2010, Plaintiff renewed her request that the ARB take action to enforce the view restriction despite voluntary actions by some property owners to trim their trees.  While Plaintiff's request was discussed at three subsequent ARB meetings, no action was taken either granting or denying her request.  Ultimately, Plaintiff opted to withdraw her request from the ARB and file suit against the property owners in December 2010.  Plaintiff's original

2

complaint sought to enforce Section 6.18 of the 2005 amended CCRs.

**{5}** However, in September 2010, Kurt Sommer, a member of the ARB, circulated ballots among the Subdivision's homeowners proposing to amend Section 6.18 by deleting the word "view." The Association did not hold meetings in regard to the proposed amendment (Sommer Amendment). Instead, Sommer included a letter with the ballots discussing the reasons for the amendment and requesting the homeowners to return the ballots directly to him by mail.

**{6}** The Sommer Amendment received majority support by the homeowners. Despite reservations by the Association's attorney and some Association board members as to the validity of the voting procedures utilized in adopting the amendment, the Association considered this vote tally sufficient under the amendment procedures provision of the CCRs to record the Sommer Amendment. The amended CCRs, now no longer restricting foliage from obstructing homeowners' views, were recorded in April 2011 by a written instrument signed by the Association president and vice-president.

**{7}** After the Sommer Amendment was recorded, Plaintiff sought and was granted leave to file an amended complaint. In her amended complaint, Plaintiff sought relief under Section 6.18 of the 2005 amended CCRs and the original CCRs and a declaratory judgment that the Sommer Amendment was void. Plaintiff subsequently filed a motion for partial summary judgment arguing that the duration clause of the CCRs prohibited the Sommer Amendment, and, alternatively, that the voting procedures used to adopt it were improper under the CCRs. Defendants filed their own joint motion for summary judgment arguing that the Sommer Amendment was properly adopted and, as such, that the CCRs no longer contained the view restriction that served as the basis for Plaintiff's suit. The district court granted Defendants' motion and ruled that the Sommer Amendment was valid and barred Plaintiff's remaining claims under the original and 2005 amended CCRs. Plaintiff now appeals.

**DISCUSSION**

**Standard of Review**

**{8}** "An appeal from an order granting a motion for summary judgment presents a question of law subject to de novo review." *Farmington Police Officers Ass'n Commc'n Workers of Am. Local 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 13, 139 N.M. 750, 137 P.3d 1204. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citations omitted).

**The CCR Provisions at Issue**

3

**{9}** We primarily confine our analysis of the CCR provisions to those provisions in the original CCRs unless otherwise stated. We do so because if the original CCRs did not permit amendments during the fifty-five-year duration period, it is immaterial whether subsequent amendments granted homeowners the authority to amend the CCRs by a majority vote.[1] The following provisions are taken from the original CCRs.

> Section 9.1 (duration clause) of the CCRs provides:
> Term of Declaration. The covenants, conditions[,] and restrictions of this Declaration shall run with and bind the Property and every part thereof, and shall inure to the benefit of and shall be enforceable by the Community Association or any Owner, his respective legal representatives, heirs, successors and assigns, for a term of fifty-five (55) years from the date this Declaration is recorded, after which time they shall be automatically extended for successive periods of ten (10) years each, unless an instrument in writing, signed by at least seventy-five [percent (75%)] of the Owners, has been recorded within the year preceding the beginning of any such ten-year period agreeding [*sic*] to terminate or revise this Declaration.

**{10}** Section 9.2 of the original CCRs is entitled "Amendment Procedure." Section 9.2 contains two subsections, one applicable to amendments prior to the first sale of a lot by the developer of the Subdivision (Declarant) and one for "Subsequent Amendments." Section 9.2's subsections provide:

> (a)    Prior to First Sale. Prior to the close of the first sale of a Lot, Living Unit or Parcel to an Owner other than Declarant or a Merchant Builder, Declarant may amend this Declaration, without the consent or assent of any individual or entity, provided said amendment does not violate the purposes and intent of the Master Development Plan and the Estancia Primera PRC Ordinance.

> (b)    Subsequent Amendments. After the close of said first sale and subject to Section 9.3, this Declaration may be amended only by the affirmative vote (in person or by proxy) or written assent of at least [fifty-one percent (51%)] of the outstanding Class A votes and with the consent of the Class C Member. Any such amendment shall not be in violation of the Master Development Plan or the Estancia Primera PRC Ordinance. Provided, however, Declarant shall have the right, at any time and from time

---

[1]For similar reasons, we agree with Plaintiff that the fact that there have been several amendments since the original CCRs were filed has no bearing on the initial issue of whether the original CCRs permitted immediately enforceable homeowner amendments. However, given our disposition in this case, the existence of subsequent amendments may have some bearing on the fact finder's determinations on remand.

to time, to unilaterally amend this Declaration or the provisions of any of the Founding Documents so as to cause the same to comply with the then current requirements of the Master Development Plan, as amended from time to time.

(Emphasis omitted.)

**{11}** Finally, Section 9.3 of the original CCRs is entitled "Limitations on Amendments." Section 9.3 states:

In addition to the restrictions stated in Section 9.6, by the acceptance of a deed for their respective Lot, Living Unit or Parcel, each Owner acknowledges and agrees, on behalf of himself and his respective successors-in-interest, personal representatives, and assigns, that: (1) this Declaration was created and recorded, in part, to protect and otherwise enhance the value of the Estancia Primera Property; and (2) in order to ensure such protection and enhancement in value, no provision or condition of this Declaration which either directly or indirectly affects the use and/or operation of the Estancia Primera Property, including, but not limited to, those provisions and conditions relating to the operation and management of the Community or Common Areas, the use by any Owner or his licensees and invitees of any part of the Property, and/or the operation of the Community Association, shall be amended or otherwise modified without the express written consent of Declarant (or its successors-in-interest or assigns).

**The Parties' Constructions**

**{12}** Each party maintains that their construction of the relevant CCR provisions is the only logical and harmonious construction. *See Montoya v. Barreras*, 81 N.M. 749, 750, 473 P.2d 363, 364 (1970) ("Restrictive covenants must be considered reasonably, though strictly, and an illogical, unnatural, or strained construction must be avoided."). "In construing a [restrictive] covenant, a court is to give effect to the intention of the parties as shown by the language of the whole instrument, considered with the circumstances surrounding the transaction, and the object of the parties in making the restrictions." *Hines Corp. v. City of Albuquerque*, 95 N.M. 311, 313, 621 P.2d 1116, 1118 (1980). We outline each of the parties' constructions below.

**{13}** Plaintiff argues a two-step construction to harmonize the fifty-five-year duration period and the seventy-five percent voting requirement in Section 9.1 with the fifty-one percent voting requirement in Section 9.2(b). First, Plaintiff contends that Section 9.1 requires homeowners to wait fifty-five years before they can take any action to decide whether they want to "terminate or revise" the CCRs. An agreement by the homeowners to terminate or amend would then require an "instrument in writing, signed by at least seventy-five [percent (75%)] of the Owners." Second, once that threshold approval has been

attained, Section 9.2 takes effect and would govern the actual adoption of proposed substantive amendments based upon the written assent or vote of the lower fifty-one percent majority. Therefore, Plaintiff contends that the Sommer Amendment is impermissible until the conclusion of the fifty-five-year duration term.

**{14}** Defendants, on the other hand, argue that while Section 9.1 does establish an initial fifty-five-year duration term, the heightened seventy-five percent voting requirement of Section 9.1 is only applicable to instances in which homeowners agree to "terminate [the CCRs], significantly abandon its restrictions and protections, or revise the primary or extended term established in Section 9.1." Defendants argue that Section 9.2's amendment procedures provide a means for making individual amendments to the CCRs and allow for these amendments before the end of the fifty-five-year duration term in Section 9.1. Thus, Defendants argue that Section 9.2 expressly allows for the Sommer Amendment during the initial fifty-five-year term based upon a majority vote of the homeowners.

**{15}** The district court agreed with Defendants' construction and concluded that the CCRs "allow[ed] for amendments to the [CCRs] prior to the expiration of the fifty-five[-]year period and any subsequent extension periods specified in the duration clause in Section 9.1 of the [CCRs]." Therefore, because a majority of the homeowners voted in favor of the Sommer Amendment, the district court concluded that there were no genuine issues of material fact, and the Sommer Amendment was valid and enforceable as a matter of law.

**The CCRs Are Ambiguous**

**{16}** In *Heltman v. Catanach*, we stated:

> Where a provision [in restrictive covenants] provides that a covenant shall remain in effect for an initial period, after which it may be modified by less than unanimous consent, courts have interpreted these provisions to simply provide an exception, after a certain number of years, to the general rule that unanimity is required in order to amend a restrictive covenant.

2010-NMCA-016, ¶ 7, 148 N.M. 67, 229 P.3d 1239. This strict enforceability of duration clauses reflects the policy that lot owners should be able to "rely on the restrict[ive covenants] for a substantial period of time without the concern that they could be subject to a change at any moment which, as just one example, could result in diminished property values." *Kauffman v. Roling*, 851 S.W.2d 789, 794 (Mo. Ct. App. 1993). However, we also review restrictive covenants using contract interpretation principles, *see Agua Fria Save The Open Space Ass'n v. Rowe*, 2011-NMCA-054, ¶ 19, 149 N.M. 812, 255 P.3d 390, and if the document allows for amendments during the duration period then we must give that language effect. *Cain v. Powers*, 100 N.M. 184, 186, 668 P.2d 300, 302 (1983) (stating that the "words in a restrictive covenant must be given their ordinary and intended meaning"). Therefore, our review of amendments to restrictive covenants that are passed without unanimous consent and during the term stated in the duration clause requires us to determine

6

whether the restrictive covenants expressly provide for the type of amendment at issue during the initial duration period. *See Estates at Desert Ridge Trails Homeowners' Ass'n v. Vazquez*, 2013-NMCA-051, ¶ 29, 300 P.3d 736 (stating that "if the covenants provide an initial duration period, . . . absent other language in the covenant to the contrary, amendments to the covenants during that initial period are void unless there is unanimous approval among the property owners").

**{17}** We disagree with the district court that Defendants' construction harmonizes the duration clause with the amendment procedures provision as a matter of law. Defendants attempt to draw parallels to many of the cases we highlighted in *Vazquez* as containing the types of express language in restrictive covenants that allow for immediately enforceable amendments. *See id.* ¶ 33; *see, e.g.*, *Good v. Bear Canyon Ranch Ass'n*, 160 P.3d 251, 254 (Colo. App. 2007) (concluding that language in duration clause stating, "This declaration and any amendments or supplements to it shall remain in effect from the date of recordation for a period of fifty . . . years" allowed for amendments during the duration period (emphasis, internal quotation marks, and citation omitted)); *Reinecke v. Kleinheider*, 804 S.W.2d 838, 841 (Mo. Ct. App. 1991) (concluding that language in a restrictive covenant that amendments could be undertaken "at any time" allowed for immediately enforceable amendments); *Miller v. Sandvick*, 921 S.W.2d 517, 519-20 (Tex. Ct. App. 1996) (concluding that restrictive covenants could be amended during duration period where amendment procedures provision stated, "[t]hese covenants may be amended at any time by an instrument signed by two-thirds (2/3) of the then owners" (internal quotation marks omitted)).

**{18}** In contrast to those cases, however, the original CCRs in the present case grant the Declarant, not the homeowners, the right to amend "at any time." Similarly, although "Declaration" is defined in the CCRs as "the covenants, conditions, and restrictions . . . as they may from *time to time be amended*[,]" this language, by itself, is not an express authorization to allow for amendments *by homeowners* during the initial duration period. This is especially true where the authority to amend "from time to time" is used throughout the CCRs in reference to the Declarant's authority to amend, not the homeowners' authority. *See Vazquez*, 2013-NMCA-051, ¶ 34 (concluding that specific authorization in the declaration to amend to allow the developer to transfer membership rights to homeowners did not evidence an intent to allow use restriction amendments by homeowners).

**{19}** However, Plaintiff's construction of these provisions is also problematic. Construing the seventy-five percent voting requirement in Section 9.1 as the voting percentage required to pass an agreement to decide to amend the CCRs contradicts our rule of construction in *Heltman*. 2010-NMCA-016, ¶ 7; *see Vazquez*, 2013-NMCA-051, ¶ 29. Standing alone, Section 9.1 would prohibit amendments during an initial fifty-five-year term, after which the CCRs can be terminated or revised, including by way of amendments, by seventy-five percent approval of homeowners. It would be illogical to conclude that the mere addition of a separate amendment procedures provision transforms the seventy-five percent voting requirement into a threshold procedural hurdle for homeowners to substantively amend the

CCRs after the conclusion of the duration period. Furthermore, while we concluded in *Vazquez* that a separate duration clause and amendment procedures provisions did not evidence an intent to allow amendments during the duration term, we were not confronted in *Vazquez* with separate voting requirement percentages in the provisions. *See Vazquez*, 2013-NMCA-051, ¶ 35. This structure could suggest that the heightened voting requirement of Section 9.1 may correspond to extensive revisions to the CCRs, not to an agreement to revise the CCRs in general before applying a majority vote to the actual substantive changes, and that such extensive revisions could not take place until the conclusion of the fifty-five-year term. Under this view, Section 9.2(b) would grant homeowners the authority to adopt certain types of lesser amendments by majority vote after sale of the first lot but subject to the limitations of Section 9.3. In other words, it is possible that the CCRs contemplate some amendments to the CCRs by the majority vote of homeowners "[a]fter the close of [the] first sale," while prohibiting other more significant amendments during the duration period and absent the seventy-five percent approval of homeowners.

**{20}** In sum, we believe that both parties' constructions highlight, rather than harmonize, the conflicting nature of the duration clause and amendment procedures provisions. Defendants would have us draw a distinction between "revise" and "amend" such that "revise" would be construed as referring to significant modifications to the CCRs commensurate with the heightened seventy-five percent voting requirement of Section 9.1. Without further support in the CCRs for such a distinction, or, at the least, an indication of the contours of the homeowners' amendment power, agreeing with Defendants' construction risks rendering the duration clause meaningless. *See Vazquez*, 2013-NMCA-051, ¶ 35. Plaintiff's construction, on the other hand, asks us to disregard that the triggering event in Section 9.2(b) allowing for homeowner amendments by majority vote is "[a]fter the close of said first sale" and not at the conclusion of the fifty-five year duration period. Regardless, assuming the homeowners were granted the authority to adopt immediately enforceable amendments, without a clearer indication of the extent of that amendment power during the duration period, merely accepting that homeowner amendments were contemplated does not necessarily lead to the conclusion that the Sommer Amendment itself was permissible as a matter of law. This is especially true where Sections 9.3 and 9.6 prohibit use restriction amendments under certain circumstances without the Declarant's consent and Section 2.4(a) permits "complementary" restrictions but prohibits revocation or significant modifications to the restrictions when passing supplementary restrictions for annexed property.

**{21}** In acknowledging the conflicting nature of these provisions, we cannot escape the conclusion that the CCRs are ambiguous. *See Jones v. Schoellkopf*, 2005-NMCA-124, ¶ 12, 138 N.M. 477, 122 P.3d 844 (stating that an "ambiguity is . . . created when provisions are reasonably and fairly susceptible to two constructions"). Resolving an ambiguity is generally a question of fact. *See Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). We recognize that in *Mark V*, our Supreme Court stated that an ambiguity can be resolved as a matter of law when no evidence is offered of the facts and circumstances surrounding the execution of the agreement leading to the conflicting interpretations. *Id.* However, we conclude that the conflicting interpretations of the CCRs

present questions of fact that preclude summary judgment and, thus, that the parties may present evidence to the fact finder regarding circumstances that may shed light on the meaning of the CCRs.

{22} In addition to addressing the conflicting provisions discussed above, the parties may choose to introduce evidence relevant to questions remaining as to whether Section 9.3 prohibits the Sommer Amendment and whether the 1998 amendment that removed reference to the Declarant was valid. As noted above, the "[a]fter the close of said first sale" language in Section 9.2(b) may indicate that the CCRs gave homeowners some authorization to amend during the duration period. Section 9.2(b) goes on to state that these amendments are subject to Section 9.3, which prohibits amendments to provisions or conditions of CCRs that affect "the use by any Owner . . . of any part of the Property" without the express written consent of the Declarant or its successors-in-interest or assigns. The view restriction at issue is among the "[u]se [r]estrictions" of Article 6 of the CCRs. Thus, under the original CCRs, the Sommer Amendment would likely be invalid without the express written consent of the Declarant or its successors-in-interest or assigns.

{23} In 1998, however, the CCRs were amended to remove references to the Declarant who, according to the notice sent to homeowners, was bankrupt and "long gone." After this amendment, Section 9.3 only required the fifty-one percent majority approval of homeowners under Section 9.2 to amend use restrictions. Thus, the question arises whether the 1998 amendment validly substituted a fifty-one percent majority homeowner vote for the express written consent of the Declarant to amend use restrictions. The parties have not argued this issue, and we express no opinion as to the 1998 amendment's ultimate validity. We merely state that this issue may warrant attention by the parties on remand in addition to the remaining issues regarding the Sommer Amendment's validity. In any event, our reversal of the summary judgment allows the parties to present whatever evidence they deem necessary to aid the fact finder in determining the meaning of the CCRs.

**Whether the Voting Procedures Complied With the CCRs Must Be Determined on Remand**

{24} Because we conclude that the district court erred in granting summary judgment on the validity of the Sommer Amendment, we reverse the district court's conclusion that the "vote exercised by the majority of [the] lot owners was proper." On remand, the fact finder should revisit this issue in the context of interpreting the ambiguities in the CCRs.

**CONCLUSION**

{25} For the foregoing reasons, we reverse the district court's order granting summary judgment and remand for proceedings consistent with this Opinion.

{26} **IT IS SO ORDERED.**

9

_____
**CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**MICHAEL E. VIGIL, Judge**

**Topic Index for _Lawton v. Schwartz_, No. 32,053**

**APPEAL AND ERROR**
Remand
Standard of Review

**CIVIL PROCEDURE**
Summary Judgment

**CONTRACTS**
Ambiguous Contracts
Restrictive Covenants

**PROPERTY**
Home Owners' Association
Restrictive Covenant